**WHITE BEAR THEATRE CORPORATION v. STATE THEATRE CORPORATION et al.**

No. 12201.

Circuit Court of Appeals, Eighth Circuit.

July 13, 1942.

Louis B. Schwartz, of Minneapolis, Minn. (Samuel P. Halpern, of Minneapolis, Minn., on the brief), for appellant.

Stan D. Donnelly, of St. Paul, Minn. (Gordon Shepard and Oppenheimer, Hodgson, Brown, Donnelly & Baer, all of St. Paul, Minn., on the brief), for appellees.

Before GARDNER, WOODROUGH, and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The question is whether the monopoly, which plaintiff's evidence showed that defendants had conspired and attempted to establish, was one which fell within the operation of section 2 of the Sherman Act, 26 Stat. 209, 15 U.S.C.A. § 2,[1] and which could afford the basis for an action for threefold damages under section 4 of the Clayton Act,[2] 38 Stat. 731, 15 U.S.C.A. § 15. The trial court held that it was not and, at the close of plaintiff's evidence, directed a verdict for defendants.

■ The suit was one brought by the owner of a motion picture theatre in White Bear Lake, Minnesota, under the statutes referred to,[3] to recover damages against the owner and officers of the only other theatre in the town, for conspiring and attempting to obtain a monopoly upon all the feature films that could be procured for "first-run" showing in that locality, in order to drive plaintiff out of business. In directing a verdict for defendants at the close of plaintiff's evidence, the trial court declared: "It is legally quite impossible to understand how the public interest could be concerned in this individual private controversy. As I view the evidence in this case, the difficulties of the parties have had no effect on interstate commerce. * * * The flow of commerce between the states and in the motion picture industry has and will continue to flow irrespective of the activities of these competitors at White Bear Lake."

■ Giving plaintiff's evidence the sig-nificance and effect to which it is entitled on a directed verdict,[4] the situation must be tested on the basis of the facts that follow, which a jury could competently have found to exist, as a matter of direct proof or of reasonable inference.

For over nineteen years, defendants' theatre had had the field to itself at White Bear Lake—a town of about 2,800 population, with a drawing territory, during the vacation season, of some 10,000 people. In May, 1939, the town council of White Bear Lake, over the protest of defendants, granted plaintiff a license to erect and operate a competing theatre. Defendant Jensen, who was the president of the defendant corporation, at that time declared: "I will tie all the pictures up and put them out of business inside of a year". Statements were made on other occasions also by defendant Jensen, to the effect that defendants would buy up all the pictures that might otherwise be available to plaintiff, so that it would not be able to operate. About the time that the foundation of plaintiff's building was being completed, defendants Jensen and Albrecht advised plaintiff that it had better sell its equity in the property to them, "right there and then", as "they had bought all the pictures in the town and, if they had not gotten them, they would get them."

At the time plaintiff had commenced the construction of its theatre building, defendants held exhibitor's contracts, for White Bear Lake, on all of the productions of four of the eight major companies in the industry, and a "selective" contract for part of the productions of a fifth company. There were thus three

---

[1] § 2. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, * * * shall be deemed guilty of a misdemeanor * * *."

[2] § 4. "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

[3] Plaintiff relies also upon § 1 of the Sherman Act, 50 Stat. 693, 15 U.S.C.A. § 1, which provides that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, * * * is hereby declared to be illegal * * *", but, in the view we take of the situation here, it is unnecessary to engage in a separate discussion of this provision. Section 1, of course, embodies a legally distinct wrong or offense from § 2, but "the two sections overlap in the sense that a monopoly under § 2 is a species of restraint of trade under § 1". United States v. Socony-Vacuum Oil Co., 310 U. S. 150, 226, footnote 59, 60 S.Ct. 811, 846, 84 L.Ed. 1129.

[4] See Johnson v. J. H. Yost Lumber Co., 8 Cir., 117 F.2d 53, 57, and cases there cited.

major producers with whom defendants then had no contracts.

The "big-eight" film companies produced all the feature films of the industry, except for a limited number of "western" or "action" films released by two independent producers. A theatre such as plaintiff's, in White Bear Lake, could not operate successfully without "first-run" rights on the output of at least three of the major producers. "Western" or "action" films could not take the place of these feature pictures, although they might be used to supplement them. The output of the three major producers, which defendants did not have under contract at the time, would have provided plaintiff with a sufficient number of feature pictures for the successful operation of its theatre.

Plaintiff had had some preliminary negotiations with the three producers referred to, before it commenced the construction of its building. While these negotiations were pending, defendants stepped in and purchased, from under plaintiff, the exhibitor's rights, for White Bear Lake, on the productions of two of these companies. They paid a higher price to one of the companies than that at which it had offered to contract its productions to plaintiff. In addition, defendants took occasion to buy up a substantial portion of the preceding season's productions of these two companies, thus making these films also unavailable to plaintiff for its early operations. Plaintiff thus succeeded in getting a contract signed with only one of the "big-eight" producers, and, even after this had been done, defendants attempted to make a "deal" with this company also. Plaintiff had to rely for the balance of its feature pictures upon the "western" films of the two independent producers and such incidental, individual film "pick-ups" as it might be able to make from time to time. In order to operate successfully, it was necessary, in a community the size of White Bear Lake, to change the programs at least three times a week.

The contracts which defendants had made for the film-year before plaintiff attempted to enter the field, covering the period from September 1, 1938, to September 1, 1939, made available to them, for exhibition, 184 films, of which they used 171. They thus had, under their 1938-1939 contracts, sufficient pictures to change their programs three times a week, and to run as many holiday bills and special midnight shows as they apparently desired. The contracts which they made for the 1939-1940 season made available to them about 300 pictures, of which they managed to exhibit 216. While they thus undertook to exhibit 45 more pictures than they had done or found necessary during the 1938-1939 season, there were still 84 pictures for which they had no possible use in their 1939-1940 operations. While some few of these films were apparently cancelled or rejected, the vast majority of them were simply paid for and not used. By paying for the films, defendants were allowed to retain their "first-run" rights on these unexhibited pictures until the close of the contract season, and thus, even though defendants did not desire to use the films, they were able to keep them from becoming available for current exhibition by plaintiff as a competitor.

All of defendants' contracts, in accordance with the universal practice in the motion picture industry, had to be approved at the home offices of the producers in New York, after their execution by defendants, before they were binding on the companies. After such approval, copies of the signed contracts, for defendants, were returned to Minnesota from New York. The contracts covered the pictures which the companies were to produce during the film year and which they would thus make available to defendants for exhibition. The films were produced either in California or in New York, and prints, made from the original negatives there, were then forwarded to the various distributing offices of the companies throughout the country, for transmittal to the contracting exhibitors as the pictures were to be shown at their respective theatres. The distributing offices, through which White Bear Lake received its pictures, were located at Minneapolis, Minnesota, and these offices served all contracting theatres in the four states of Minnesota, Wisconsin, North Dakota and South Dakota. The films, of course, were not sold to the exhibitors, but their use was simply licensed, so that the several prints moved back and forth in the four-state area, through the distributing offices at Minneapolis, as they were to be shown by the individual exhibitors. The films which defendants paid for but did not intend to exhibit were not sent out from the distributing offices at Minneapolis to White Bear Lake. As the films became unfit for further showing, or after all exhibitor's

contracts had been fulfilled in the distributing area, the films were returned from Minneapolis to the offices of the companies in New York or California.

■ On the facts thus shown by plaintiff's evidence, the making of the licensing agreements between the producers and the exhibitors and the supplying of the films pursuant thereto were clearly a part of interstate commerce.[5] The distribution of the films through the Minneapolis offices of the producers, as well as the other necessary incidents involved, by which alone "first-run" films could become or were made available for use by any of the local exhibitors under their previously existing contracts, including those of defendants at White Bear Lake, were component processes in that commerce, because of their necessary contribution to the whole.[6] In fact, in so far as the films were sent from New York or California, to the distributing offices of the producers in Minnesota, to fulfill previous contracts with exhibitors in that area, and with the intention and practice of returning them immediately thereafter to the home offices of the companies, the whole thing was in reality a mere cycle of interstate commerce. But without pausing to consider this broader concept here, it is sufficient to repeat that the processes upon which an exhibitor had to rely in obtaining "first-run" films for a theatre at White Bear Lake, or to which a producer had to resort in undertaking to supply them to him, manifestly constituted interstate commerce.

■ Since, under the evidence here, the market for the purchase of "first-run" film rights by an exhibitor at White Bear Lake, or for the sale of such rights and the supplying of films on the part of a producer,

existed only in the channels, and as a part of the stream, of interstate commerce, it necessarily constituted an "interstate market". The competitive freedom of such a market, in both buying and selling,[7] is one of the principal things which the Sherman Act was intended to protect.[8] Where that freedom is interfered with, by a contract, combination, or conspiracy, that from a public viewpoint harmfully restrains competition, or by an attempt, combination or conspiracy to monopolize, that has a direct wrongful purpose or probable prejudicial consequences to the public interest, the force of the Sherman Act may be called into operation against it, on the basis of the public wrong involved, through the public or private remedies which the Sherman and Clayton Acts provide.[9]

Here, on plaintiff's evidence, there was a conspiracy and an attempt to monopolize the "first-run" films of the interstate market, with the wrongful intent of thereby driving plaintiff out of the motion picture business at White Bear Lake. The purpose of the monopoly was thus, not to insure defendants a sufficient supply of pictures for the legitimate conduct of their business under competitive conditions, but to prevent such films as defendants did not need and could not reasonably use from being available to plaintiff in the interstate market. The result of the conspiracy and attempted monopoly, in addition to the injury to plaintiff, was to deprive the populace of White Bear Lake and its environs of having exhibited to them locally, during the current film season, a large number of "first-run" productions which they would otherwise have had the opportunity to see. A further result was that this sub-

---

[5] See Binderup v. Pathé Exchange, Inc., 263 U.S. 291, 309, 310, 44 S.Ct. 96, 68 L.Ed. 308; Boynton v. Fox West Coast Theatres Corp., 10 Cir., 60 F.2d 851, 853.

[6] Stafford v. Wallace, 258 U.S. 495, 516, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229; Federal Trade Commission v. Pacific States Paper Trade Association, 273 U.S. 52, 64, 47 S.Ct. 255, 71 L.Ed. 534.

[7] Montrose Lumber Co. v. United States, 10 Cir., 124 F.2d 573, 577.

[8] Apex Hosiery Co. v. Leader, 310 U.S. 469, 493, 511, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; Northern Securities Co. v. United States, 193 U.S. 197, 337, 341, 24 S.Ct. 436, 48 L.Ed.

679; United States v. Patten, 226 U.S. 525, 541, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325; United States v. General Motors Corp., 7 Cir., 121 F.2d 376, 403; Mitchell Woodbury Corporation v. Albert Pick-Barth Co., 1 Cir., 41 F.2d 148, 151.

[9] Labor cases are, of course, not involved in the present consideration. For the application of the Sherman Act to such organizations, see Apex Hosiery Co. v. Leader, 310 U.S. 469, 487, 488, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788; Truck Drivers' Local No. 421 v. United States, 8 Cir., 128 F.2d 227.

stantial number of films, which would otherwise have moved in the channels of interstate commerce through the distributing offices at Minneapolis to White Bear Lake, was artificially blocked in its flow at Minneapolis.

■ Strangling the competitive forces of the interstate market on "first-run" films for White Bear Lake, by tying up pictures not reasonably required for the legitimate conduct of defendants' business, and with the object of excluding plaintiff from the market and thereby driving it out of the exhibiting field; depriving the populace of White Bear Lake and environs of the privilege of seeing productions at the times and in the manner that they would otherwise have been exhibited to them, if the competitive forces of the interstate market had not thus been improperly strangled; and artificially blocking at Minneapolis the flow of interstate commerce which, on the films for which defendants paid but did not use, would otherwise have moved into White Bear Lake—these were all matters of sufficient general public interest to bring the situation within the operation of the Sherman Act.

■ That the same number of films moved from California or New York into Minnesota, in spite of defendants' actions, would not be controlling here, as defendants contend and as the trial court apparently believed. Volume is only one of the incidents of commerce and only one of the respects in which there may be a restraint violative of the Sherman Act. As a matter of fact, however, as we have already pointed out, defendants' actions in the present situation did materially affect the volume of interstate commerce which would otherwise have moved into White Bear Lake in the particular field involved, by the artificial obstruction, at Minneapolis, of the flow of films which defendants paid for and did not use. What relationship

the commerce of White Bear Lake bore in the interstate market to that of the immediate four-state area serviced, or to that of the industry as a whole, would be quite immaterial.[10] In principle, and within the intendment of the Sherman Act, public interest is as much concerned with the improper control of the interstate market, on the buyer's or seller's side, for the little town of White Bear Lake as for the great metropolis of New York City, or for any state, or for the country as a whole.

■ The attempts of defendants to monopolize the "first-run" films in commerce, for the purpose of putting plaintiff out of the motion picture theatre business at White Bear Lake, must consequently, on plaintiff's evidence, be held to have presented a case for the jury, under the Sherman Act.[11]

■ ■ Defendants, in an effort to sustain the judgment, argue here that plaintiff's evidence of damages should be held to be insufficient to make a case for the jury, and that, on this theory, the action of the trial court in directing a verdict, though based on other grounds, can properly be upheld. The statute allows a recovery for damages to "business or property",[12] from any violation of the Act. There is evidence in the record of the lessened value of plaintiff's theatre property, from defendants' wrongful acts under the statute, sufficient to permit the question of damages to be submitted to the jury.[13] The argument of defendants on the proof of damages in the present situation goes only to the weight of the evidence offered and to the credibility of plaintiff's witnesses, and these matters necessarily can not be given consideration here. Other contentions also have been made by defendants which are wholly within the jury's domain, and which will therefore not be discussed.

[10] "And the amount of interstate or foreign trade involved is not material (Montague & Co. v. Lowry, 193 U.S. 38, 24 S. Ct. 307, 48 L.Ed. 608), since § 1 of the Act brands as illegal the character of the restraint not the amount of commerce affected." United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 225, note 59, 60 S.Ct. 811, 845, 84 L.Ed. 1129.

"The provisions of sections 1 and 2 have both a geographical and distributive significance and apply to any part of the United States as distinguished from the

whole and to any part of the classes of things forming a part of interstate commerce." Indiana Farmer's Guide Publishing Co. v. Prairie Farmer Publishing Co., 293 U.S. 268, 279, 55 S.Ct. 182, 185, 79 L.Ed. 356.

[11] Cf. C. E. Stevens Co. v. Foster & Kleiser Co., 311 U.S. 255, 61 S.Ct. 210, 85 L.Ed. 173.

[12] 38 Stat. 731, 15 U.S.C.A. § 15.

[13] See Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544.

Defendants have argued the question of the sufficiency of the evidence only generally, as applied to all of them jointly, and not its significance in relation to them individually or separately. While plaintiff's evidence of conspiracy clearly was sufficient to go to the jury as against defendants State Theatre Corporation, Jensen and Albrecht, it is doubtful if it sufficiently showed joinder or participation in the conspiracy or attempted monopoly by defendant Naas, who appears to have been wholly inactive in the business. Since the point has not been urged here, however, we relegate the question to the consideration of the trial court on a new trial.

The judgment is reversed and the cause is remanded for a new trial.