**UNITED STATES v. LORAIN JOURNAL CO. et al.**

**Civ. A. No. 26823.**

United States District Court
N. D. Ohio, E. D.

Aug. 29, 1950.

Don C. Miller, Cleveland, Ohio, Victor H. Kramer, Victor A. Altman, and Baddia J. Rashid, Washington, D. C., and Robert B. Hummel and Norman Seidler, Cleveland, Ohio, for plaintiff.

Parker Fulton and Charles A. Baker, Cleveland, Ohio, for defendants.

FREED, District Judge.

This is a civil action instituted by a complaint filed by the United States under Section 4 of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, against the defendants, The Lorain Journal Company, an Ohio corporation which publishes the Journal and Times-Herald (hereinafter the "Journal"), Samuel A. Horvitz, Vice President, Secretary, and a director of the corporation, Isadore Horvitz, President, Treasurer, and a director of the corporation, D. P. Self, Business Manager of the Journal, and Frank Maloy, Editor of the Journal. It seeks to enjoin them from continuing to engage in certain acts in furtherance of an alleged combination and conspiracy in restraint of the interstate commerce of competitive news and advertising media and of their advertisers in violation of Section 1 of the Act, and an alleged combination and conspiracy to monopolize and an attempt

to monopolize news and advertising channels in violation of Section 2 of the Act.

There is no dispute as to those salient facts which are dispositive of the issues raised. Since 1933, the Lorain Journal has been the only daily (excluding Sunday) newspaper of general circulation published in Lorain, Ohio, a city with a population of approximately 52,000. Prior to that time a competing daily newspaper called the Times-Herald was published and circulated in Lorain, but in December, 1932 its assets were purchased by the Lorain Journal Company, the Mansfield Journal Company, and defendant Samuel A. Horvitz.

The Journal's position in the community is a commanding and an overpowering one. It has a daily circulation in Lorain of over 13,000 copies and it reaches ninety-nine per cent of the families in the city. The Lorain Sunday News is a small weekly published in Lorain on Sundays only. It has a circulation of slightly over 3,000 copies, distributed almost exclusively in Lorain. The Chronicle-Telegram, a daily (excluding Sunday) newspaper of general circulation, is published eight miles away in Elyria, Ohio, but that newspaper is not distributed in Lorain although the Journal is sold in Elyria. The one morning and two afternoon newspapers published in nearby Cleveland have some circulation in Lorain, but the Journal enjoys more than two-thirds of the combined Lorain circulation of the four newspapers.

The evidence makes it clear that the Journal has no competitor for the newspaper advertisements of Lorain merchants except for the extremely limited competition provided by the Lorain Sunday News.

The first serious competitive cloud appeared on the Journal's previously unlimited horizon in October, 1948, when, pursuant to Federal Communications Commission's license, radio stations WEOL and WEOL-FM began broadcasting operations from studios in Lorain and Elyria. The Journal had previously attempted without success to obtain a radio broadcasting license.

The principal charge of the complaint and the proof was that the defendants formulated and put into execution a plan designed and intended to eliminate this threat by the device of refusing to publish advertisements for local merchants who used the radio stations.[1]

■ This charge has been clearly established. The record reveals a story of bold, relentless, and predatory commercial behavior. The Journal, its officers and employees, informed merchants who proposed to advertise over the radio stations that if they did so, their terminable advertising contracts with the Journal would be brought to an end and would not be renewed. The Journal monitored the programs of WEOL to learn who was using the advertising facilities of the radio station and those who did advertise over the radio had their contracts terminated, and were permitted to renew them only after they ceased to use WEOL. Numerous Lorain County merchants testified that, as a result of the Journal's policy, they either ceased or abandoned their plans to advertise over WEOL.

The Journal refused to carry the program logs of WEOL as paid advertisements although it prints the logs of some Cleveland stations in its news columns, and it even refused to publish an advertisement seeking employees to staff the radio station.

No excuse was offered to the prospective advertiser in many instances for the peremptory refusal to accept the advertising if he used the radio station. On some occasions, when merchants remonstrated or sought an explanation, they were informed that it was the policy of the Journal to require advertisers to give the radio a "fair" —that is an exclusive—trial or they were informed that the policy was designed to "protect" the Lorain merchants by preserving the integrity of the Lorain market.

1. In addition to this central theme of the complaint and the proof, the Government charged the defendants with practices directed against the Lorain Sunday News and the Elyria Chronicle-Telegram. Some proof was adduced in support of these charges but that proof is too inconclusive to justify the findings sought by the Government. Those charges are therefore disregarded in the main body of this memorandum.

Those same rationalizations were advanced to this Court as the justifications for the behavior of the defendants, and this Court, like the Lorain merchants to whom they were first presented, is not convinced. The assertion that the Journal's policy was designed to permit advertisers to give the radio a fair test is too specious for any comment other than that it is unworthy of belief and unworthy of the astuteness and sharp business intelligence noticeably displayed on the witness stand by the defendant Samuel Horvitz, the dominant figure in the operation of the Journal. That the Journal was attempting to create an economic oasis in Lorain seems incredible, and it is difficult for the Court to see how the defendants could reasonably ascribe this activity to a benevolent desire to protect the Lorain merchants from themselves where the obvious result was to deprive those merchants of a channel which might attract additional business to their market at the very time that merchants in neighboring communities served by WEOL were using it for that purpose.

From the evidence there can be no doubt that the policy was as uncomplicated in purpose and as lacking in subtlety as the profit motive itself; the Journal sought to eliminate this threat to its pre-eminent position by destroying WEOL.

WEOL was licensed for the purpose of serving an area located wholly within the boundaries of Ohio. However, its broadcasts can be and are heard in southeastern Michigan. Numerous persons testified that they heard the broadcasts from WEOL on home or automobile receiving sets in Michigan, and it was agreed that additional witnesses would give similar testimony if called. A radio engineer who conducted field tests gave his opinion that WEOL might be satisfactorily heard on receiving sets in various places in southeastern Michigan during daylight hours.

WEOL is not affiliated with any national network. The majority of its programs originate in its local studios. However, in the past year, it carried broadcasts of over one hundred athletic events originating at places outside of Ohio. About sixty-five per cent of WEOL's broadcast time is devoted to the playing of musical transcriptions which are leased to WEOL by companies located outside of Ohio. WEOL devotes about ten to twelve per cent of its total broadcast time to news broadcasts. These broadcasts consist in part of world and national news gathered outside of Ohio and provided to WEOL by United Press teletype.

The income of WEOL is predominantly derived from the advertising of local merchants. Sixteen per cent of its gross income in 1949 was obtained from "national advertisers" who seek to promote good will for a particular product on a national scale. In a relatively few instances WEOL has broadcast advertising for out-of-state suppliers who were soliciting orders to be filled by direct shipment. There was no evidence that either of these two classes of advertisers has yet been refused access to the columns of the Journal because of their use of WEOL.

These are the facts upon which the Government predicates its charges, foremost of which is the charge of an attempt to monopolize.

■ The position of the Journal as the only significant medium of newspaper advertising in the City of Lorain may not, in and of itself, have constituted monopolization within the meaning of the Sherman Act, although it is a monopoly in common parlance. But the abuse of the power inherent in its position to compel a customer boycott of WEOL is a different matter. For "the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful." U. S. v. Griffith, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236.

■ The defendants have urged upon the Court, in another connection, the principle that a single trader has a right to deal or to refuse to deal with whomever it pleases for whatever reason it pleases, so long as it does not combine with others to achieve its end. The classic statement of that doctrine recognized the right only in "the absence of any purpose to create or maintain a monopoly". U. S. v. Colgate & Co., 250 U.S. 300, 307, 39

S.Ct. 465, 468, 63 L.Ed. 992, 70 A.L.R. 443. The Journal admittedly has a right to select its advertisers for good reason or without reason, but it has no right in pursuit of a monopoly to require them not to deal with a competitor.

■ Where that is the purpose and design with which the defendants act, it is legally immaterial whether the course of action is or might be successful. As a practical matter no enterprise would single-handedly embark upon or persist in such behavior unless attainment were a possibility. The success crowning the Journal's efforts does not result from competition in the healthy sense of superior business skill and efficiency, but from the fact that while the Journal and WEOL are competitors, there is an area where the services they provide are complementary rather than competitive in nature. A customer rebuked by one does not have entire satisfaction merely because he may resort to the other. The Journal has used this leverage to prevent any encroachment upon its supremacy in the field where WEOL is in strict competition with it.

The defendants do not in effect deny that they have attempted to monopolize, but they seek to avoid the ban of the Sherman Act on the ground that only a local monopoly and not a monopoly of interstate commerce was sought. Assume that a monopoly of the business of selling news locally does not involve a monopoly of the interstate channels through which that "commodity" comes to Lorain. And assume further that the monopoly of the business of selling advertising space locally does not constitute a monopoly of interstate business because out-of-state advertisers use that service. See Blumenstock Bros. Advertising Agency v. Curtis Publishing Co., 252 U.S. 436, 40 S.Ct. 385, 64 L.Ed. 649. But cf. U. S. v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S. Ct. 1162, 88 L.Ed. 1440. Even under these assumptions it does not follow that the defendants' attempt to monopolize the business of selling news and advertising space locally is beyond the reach of the Sherman Act.

■ Local monopolies are proscribed by the Act where they are achieved or sought by restraint of interstate commerce. Stevens Co. v. Foster & Kleiser, 311 U.S. 255, 61 S.Ct. 210, 85 L.Ed. 173; William Goldman Theaters, Inc., v. Loews, Inc., 3 Cir., 150 F.2d 738; White Bear Theater Corp. v. State Theater Corp., 8 Cir., 129 F.2d 600. See Mandeville Islands Farms, Inc., v. American Crystal Sugar Co., 334 U.S. 219, 235-336, 68 S.Ct. 996, 92 L.Ed. 1328. In these cases local monopolies were achieved by combination or agreement with, or the exertion of pressure upon out-of-state suppliers to exclude others from a local market. The means through which local monopoly was effectuated "restrained" interstate commerce by restricting the freedom of a local buyer to purchase in the interstate market or the freedom of the interstate seller to sell in the local market.[2]

■ The means employed by the defendants to achieve their purpose has not in that sense restrained interstate commerce, but the ultimate end here is the destruction of the radio station in all its aspects. Having the plan and desire to injure the radio station, no more effective and more direct device to impede the operations and to restrain the commerce of WEOL could be found by the Journal than to cut off its bloodstream of existence—the advertising revenues which control its life or demise. And in this Court's judgment WEOL is engaged in interstate commerce and therefore entitled to the protection of the Sherman Act.

It is doubtful whether there exists a purely "intra-state" radio station. "By its very nature broadcasting transcends state lines and is national in its scope and importance—characteristics which bring it within the purpose and protection, and subject it to the control, of the commerce clause." Fisher's Blend Station v. State

---

2. White Bear Theater Corp. v. State Theater Corp., supra, falls into this pattern, for the purchase of the entire supply of the particular commodity blocked the access of a local competitor to the interstate market.

Tax Commission, 297 U.S. 650, 655, 56 S. Ct. 608, 610, 80 L.Ed. 956.[3]

Perhaps a radio station which never broadcasts a program originating outside of the state and which is never heard beyond the boundaries of a single state might, within the concept of the Sherman Act, be treated as a purely local business. Even if that were true, WEOL differs in those two significant features. While WEOL was licensed to serve and primarily serves an area located wholly within the state, the evidence establishes that it can be and is heard in Michigan. Nor can the Court disregard these transmissions as inconsequential, for they have not resulted from a felicitous combination of circumstances on merely a few, sporadic occasions, but have taken place, the Court must conclude from the only line of evidence presented, with a fair degree of regularity.

The transmissions of WEOL which have their origin as broadcast energy outside of Ohio comprise interstate commerce though heard only by listeners within the state, for WEOL is an inseparable link in the chain of an interstate journey which carries the voice of the speaker to the ear of the listener. While these broadcasts of athletic events may represent but a small portion of WEOL's program schedule, they can not be dismissed as trifling. WEOL was licensed in response to a public need and interest, and it must be assumed that, although it may not be the only avenue through which these interstate programs can reach the local community, it provides an important medium for this service.

The defendants make much of the fact that they did nothing more than inhibit the intercourse between local merchants and the radio station and proclaim that they had no desire to prevent the radio station's transmissions which come from out of state or which passed across state lines. Here, the defendants ignore the fact that the radio station may be completely driven out of existence by depriving it of adver-tising revenue. A radio station, unlike a newspaper, does not sell the news and entertainment it provides. Advertising revenues support the service provided to the listening public. It is not necessarily true that local merchants are indifferent to whether their advertising messages reach listeners in Michigan, but, even if that be true, it would not follow that those listeners are indifferent to the programs they hear.

▪ While the activities of the defendants may be local in execution, the very existence of WEOL is imperiled by this attack upon one of its principal sources of business and income. Although the Sherman Act is not a panacea to cure every local commercial evil and hindrance to local competition, the present context of facts offers a situation within its scope, for the attempted monopoly threatens a business which in inseparable characteristics, if not in volume, is undeniably interstate in nature. The Sherman Act is the foundation of economic freedom in interstate commerce and to that end it sweeps aside restrictive practices local in setting which substantially affect an interstate business. U. S. v. Women's Sportwear Manufacturers Ass'n, 336 U.S. 460, 69 S.Ct. 714, 93 L.Ed. 805. This Court is pressed to the conclusion that radio broadcasting in general, and radio station WEOL in particular, is entitled to the protection the Act affords.

The remaining charges of conspiracy to restrain and to monopolize pose a problem to which a great deal of attention has been devoted by both the Government and defendants: namely, whether a conspiracy within the meaning of the Sherman Act can be found to exist between and among a single corporation and the officers and employees who act for it. For the defendants argue that the "conspiracy" here is the formulation of business policy for a single enterprise.

---

3. See also, Wilson v. Shuman, 8 Cir., 140 F.2d 644, Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq.; Los Angeles Broadcasting Co., 4 N.L.R.B. 443 (National Labor Relations Act, 29 U.S.C.A. § 151 et seq.). On the question of the power of the state to tax the activity of radio broadcasting, see the annotation at 11 A.L.R.2d 986.

■ That problem is not presented in connection with the charge of attempted monopolization for a single corporation and the individuals through whom it acts and who shape its intentions can commit that offense. U. S. v. MacAndrews & Forbes Co., C.C., 149 F. 823, 836, writ of error dismissed 212 U.S. 585, 29 S.Ct. 681, 53 L.Ed. 661; Fleetway, Inc. v. Public Service Interstate Transportation Co., 3 Cir., 72 F.2d 761, certiorari denied 293 U.S. 626, 55 S.Ct. 347, 79 L.Ed. 713.

Defendants urge that the individual corporation has at its disposal only so much commercial strength, which is not altered in effectiveness whether it acts through only one or through more of its officers and employees. And the defendants' argument is in substance that the conspiracy sections of the Sherman Act were designed to strike only at those situations where the economic power exerted has been enhanced by a confederacy of otherwise independent business enterprises and not where coercive restraints are attempted or accomplished by a so-called "single trader".

The Government contends that there is no reason of language why the Sherman Act should receive an interpretation different from that which has been given to other conspiracy statutes.[4] And as for the substantive argument of defendants, the Government presses upon the Court that line of cases which have emphasized the character of the restraint rather than the economic oneness of the offending conspirators.[5]

■ It has been demonstrated that the monopoly attempted by the Journal—even conceived of as an attempt to monopolize only local business—is proscribed by the Sherman Act. The relief to be granted for that violation of law should terminate all the abuses in which the defendants indulged. This renders the solution of the controversy in respect of the charges of conspiracy of mere academic interest, and makes its determination unnecessary in this instance.

■ The relief to be granted brings from the defendants an appeal to the constitutional guarantee of a free press. At the outset, it can no longer be denied that newspapers like other businesses are subject to the Sherman Act. Associated Press v. U. S., 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013; Associated Press v. National Labor Relations Board, 301 U.S. 103, 133, 57 S.Ct. 650, 81 L.Ed. 953. The defendants do not contend that the criminal sanctions of the Act would be inapplicable, but they assert that the Court is powerless to issue even a prohibitory injunction restraining them from refusing to accept advertising where the basis for such refusal is the advertiser's use of the radio station, since to do so would involve a "prior restraint" upon their freedom to publish or to refuse to publish whatever they wish.

There is no appeal to any Court more apt to strike a responsive chord than an appeal to rights guaranteed by the First Amendment and under no consideration would this Court reach the conclusions here expressed were they instrumental in undermining or even affecting a free press. In the balance of our constitutional scheme the importance of the First Amendment may be such that sanctions consonant with the Commerce Clause, art. 1, § 8, cl. 3, and clearly applicable to other enterprises can not be used against a newspaper. Sun Publishing Co. v. Walling, 6 Cir., 140 F.2d 445, certiorari denied 322 U.S. 728, 729, 64 S.Ct. 946, 88 L.Ed. 1564.

■ With all this, the Court can not conceive that the First Amendment renders

4. Mininsohn v. U. S., 3 Cir., 101 F.2d 477; Egan v. U. S., 8 Cir., 137 F.2d 369, certiorari denied 320 U.S. 788, 64 S.Ct. 195, 88 L.Ed. 474; Miller v. U. S., 6 Cir., 125 F.2d 517, certiorari denied 316 U.S. 687, 62 S.Ct. 1276, 86 L.Ed. 1759. See American Medical Association v. U. S., 76 U.S. App.D.C. 70, 130 F.2d 233, 253.

5. Schine Chain Theaters, Inc. v. U. S., 334 U.S. 110, 116, 68 S.Ct. 947, 92 L.Ed. 1245; U. S. v. Yellow Cab, 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010; U. S. v. General Motors Corp., 7 Cir., 121 F.2d 376, 404, certiorari denied 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497; U. S. v. New York Great A. & P. Co., 5 Cir., 173 F.2d 79, 87–88. And see Patterson v. U. S., 6 Cir., 222 F. 599.

it impotent to enjoin the defendants' practices. The right of a newspaper to reject advertising arises from the fact that a free press is also a private business. The defendants did not exercise their right of rejection because the advertising offered was offensive in substance or even because the prospective advertisers were not the sort of persons with whom they wished to deal. Their refusal to deal was based solely on a desire to force these advertisers not to continue or to enter into relations with another available mode of communication. This is a vice condemned by the Sherman Act and the evil may be restrained without affecting the operations of the Journal as an organ of opinion and without touching upon the legitimate conduct of its business affairs. Prior restraint on the substance of expression is one thing; injunctive relief against the repetition of the commercial abuse proved here is quite another.

It would be strange indeed to pervert the liberty proclaimed by the First Amendment into a license for the continuation of a dictatorial course of action designed to suppress another and equally important instrumentality of information and expression. The purposes sought to be served by that Amendment would not survive many such paradoxes.

The United States is entitled to relief.

In conformity with Rule 4B of this Court, findings of fact and conclusions of law will be submitted and the Government will likewise submit a proposed form of decree.