# LORAIN JOURNAL CO. ET AL. v. UNITED STATES.

No. 26.  Argued October 17, 1951.—Decided December 11, 1951.

*William E. Leahy* argued the cause for appellants. With him on the brief were *William J. Hughes, Jr., Parker Fulton* and *King E. Fauver.* *Robert M. Weh* was also of counsel.

*Solicitor General Perlman* argued the cause for the United States. With him on the brief were *Assistant Attorney General Morison, J. Roger Wollenberg, Robert L. Stern, Baddia J. Rashid* and *Victor H. Kramer.*

MR. JUSTICE BURTON delivered the opinion of the Court.

The principal question here is whether a newspaper publisher's conduct constituted an attempt to monopolize interstate commerce, justifying the injunction issued against it under §§ 2 and 4 of the Sherman Antitrust Act.[1] For the reasons hereafter stated, we hold that the injunction was justified.

---

[1] "SEC. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several

This is a civil action, instituted by the United States in the District Court for the Northern District of Ohio, against The Lorain Journal Company, an Ohio corporation, publishing, daily except Sunday, in the City of Lorain, Ohio, a newspaper here called the Journal. The complaint alleged that the corporation, together with four of its officials, was engaging in a combination and conspiracy in restraint of interstate commerce in violation of § 1 of the Sherman Antitrust Act, and in a combination and conspiracy to monopolize such commerce in violation of § 2 of the Act, as well as attempting to monopolize such commerce in violation of § 2.[2]  The District Court declined to issue a temporary injunction but, after trial, found that the parties were engaging in an attempt to monopolize as charged.  Confining itself to that issue, the court enjoined them from continuing the attempt. 92 F. Supp. 794.  They appealed to this Court under the Expediting Act of 1903, 32 Stat. 823, as amended, 62 Stat. 989, 15 U. S. C. (Supp. IV) § 29, and the issues before us are those arising from that finding and the terms of the injunction.

States, or with foreign nations, shall be deemed guilty of a misdemeanor . . . .

"SEC. 4. The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney-General, to institute proceedings in equity to prevent and restrain such violations. . . ." 26 Stat. 209, 36 Stat. 1167, 15 U. S. C. §§ 2 and 4.

[2] The individual defendants named in the complaint were Samuel A. Horvitz, vice president, secretary and a director of the corporation; Isadore Horvitz, president, treasurer and a director; D. P. Self, business manager; and Frank Maloy, editor.  Each participated in the conduct alleged to constitute the attempt to monopolize.  Maloy has died pending the appeal.

The appellant corporation, here called the publisher, has published the Journal in the City of Lorain since before 1932. In that year it, with others, purchased the Times-Herald which was the only competing daily paper published in that city. Later, without success, it sought a license to establish and operate a radio broadcasting station in Lorain. 92 F. Supp. 794, 796, and see *Lorain Journal Co.* v. *Federal Communications Comm'n,* 86 U. S. App. D. C. 102, 180 F. 2d 28.

The court below describes the position of the Journal, since 1933, as "a commanding and an overpowering one. It has a daily circulation in Lorain of over 13,000 copies and it reaches ninety-nine per cent of the families in the city." 92 F. Supp. at 796. Lorain is an industrial city on Lake Erie with a population of about 52,000 occupying 11,325 dwelling units. The Sunday News, appearing only on Sundays, is the only other newspaper published there.[3]

While but 165 out of the Journal's daily circulation of over 20,000 copies are sent out of Ohio, it publishes not only Lorain news but substantial quantities of state, national and international news. It pays substantial sums for such news and for feature material shipped to it from various parts of the United States and the rest of the world. It carries a substantial quantity of national ad-

---

[3] The Sunday News has a weekly circulation of about 3,000 copies, largely in Lorain. The Chronicle-Telegram is a newspaper published daily, except Sunday, eight miles away in Elyria. It has a daily circulation in that city of about 9,000 but none in Lorain. The Cleveland Plain Dealer, News and Press are metropolitan newspapers published daily, except Sunday, in Cleveland, 28 miles east of Lorain. They have a combined daily circulation in Lorain of about 6,000. The Cleveland Sunday Plain Dealer has a Sunday circulation in Lorain of about 11,000. The Cleveland papers carry no Lorain advertising and little Lorain news. No reference has been made in the record or in the argument here to competition from any radio station other than WEOL.

vertising sent to it from throughout the United States. Shipments and payments incidental to the above matters, as well as the publisher's purchases of paper and ink, involve many transactions in interstate or foreign commerce.

From 1933 to 1948 the publisher enjoyed a substantial monopoly in Lorain of the mass dissemination of news and advertising, both of a local and national character. However, in 1948 the Elyria-Lorain Broadcasting Company, a corporation independent of the publisher, was licensed by the Federal Communications Commission to establish and operate in Elyria, Ohio, eight miles south of Lorain, a radio station whose call letters, WEOL, stand for Elyria, Oberlin and Lorain.[4] Since then it has operated its principal studio in Elyria and a branch studio in Lorain. Lorain has about twice the population of Elyria and is by far the largest community in the station's immediate area. Oberlin is much smaller than Elyria and eight miles south of it.

While the station is not affiliated with a national network it disseminates both intrastate and interstate news and advertising. About 65% of its program consists of music broadcast from electrical transcriptions. These are shipped and leased to the station by out-of-state suppliers. Most of them are copyrighted and the station pays royalties to the out-of-state holders of the copy-

---

[4] The license also covers WEOL–FM but the two stations are here treated as one. WEOL operates on a frequency of 930 kilocycles and WEOL–FM of 107.6 megacycles. The station outlines its primary listening or market area on the basis of a half millivolt daytime pattern and a two millivolt nighttime pattern. Its day pattern reaches an area containing all or part of 20 counties and an estimated population of over 2,250,000. Its night pattern reaches an area containing parts of nine of these counties and an estimated population of about 450,000. Lorain County, which includes the communities of Lorain, Elyria and Oberlin, contains about 120,000 people, 52,000 of whom live in the City of Lorain.

rights. From 10 to 12% of the station's program consists of news, world-wide in coverage, gathered by United Press Associations. The news is received from outside of Ohio and relayed to Elyria through Columbus or Cleveland. From April, 1949, to March, 1950, the station broadcast over 100 sponsored sports events originating in various states.

Substantially all of the station's income is derived from its broadcasts of advertisements of goods or services. About 16% of its income comes from national advertising under contracts with advertisers outside of Ohio. This produces a continuous flow of copy, payments and materials moving across state lines.[5]

The court below found that appellants knew that a substantial number of Journal advertisers wished to use the facilities of the radio station as well. For some of them it found that advertising in the Journal was essential for the promotion of their sales in Lorain County. It found that at all times since WEOL commenced broadcasting, appellants had executed a plan conceived to eliminate the threat of competition from the station. Under this plan the publisher refused to accept local advertisements in the Journal from any Lorain County advertiser who advertised or who appellants believed to be about to advertise over WEOL. The court found expressly that the

---

[5] Other findings show that the station broadcasts advertisements of goods and services on behalf of suppliers outside of Ohio. These sometimes result in interstate orders and shipments. Orders received by its local advertisers are sometimes filled by out-of-state suppliers. The station's broadcasts inevitably reach across state lines. They are heard with some regularity by many people in southeastern Michigan. The application which led to WEOL's license was considered by the Federal Communications Commission in conjunction with an application for another license, sought by a Michigan station, involving possible conflicts between its coverage and that of WEOL.

purpose and intent of this procedure was to destroy the broadcasting company.

The court characterized all this as "bold, relentless, and predatory commercial behavior." 92 F. Supp. at 796. To carry out appellants' plan, the publisher monitored WEOL programs to determine the identity of the station's local Lorain advertisers. Those using the station's facilities had their contracts with the publisher terminated and were able to renew them only after ceasing to advertise through WEOL. The program was effective. Numerous Lorain County merchants testified that, as a result of the publisher's policy, they either ceased or abandoned their plans to advertise over WEOL.

> "Having the plan and desire to injure the radio station, no more effective and more direct device to impede the operations and to restrain the commerce of WEOL could be found by the Journal than to cut off its bloodstream of existence—the advertising revenues which control its life or demise.

> . . . . .

> ". . . the very existence of WEOL is imperiled by this attack upon one of its principal sources of business and income." *Id.,* at 798, 799.

The principal provisions of the injunction issued by the District Court are not set forth in the published report of the case below but are printed in an Appendix, *infra,* pp. 157–159. Sections IV and V B of the decree, relating to notices, are stayed pending final disposition of this appeal.

1. *The conduct complained of was an attempt to monopolize interstate commerce.* It consisted of the publisher's practice of refusing to accept local Lorain advertising from parties using WEOL for local advertising. Because of the Journal's complete daily newspaper monopoly of local advertising in Lorain and its practically

150

indispensable coverage of 99% of the Lorain families, this practice forced numerous advertisers to refrain from using WEOL for local advertising. That result not only reduced the number of customers available to WEOL in the field of local Lorain advertising and strengthened the Journal's monopoly in that field, but more significantly tended to destroy and eliminate WEOL altogether. Attainment of that sought-for elimination would automatically restore to the publisher of the Journal its substantial monopoly in Lorain of the mass dissemination of all news and advertising, interstate and national, as well as local. It would deprive not merely Lorain but Elyria and all surrounding communities of their only nearby radio station.

There is a suggestion that the out-of-state distribution of some copies of the Journal, coupled with the considerable interstate commerce engaged in by its publisher in the purchase of its operating supplies, provided, in any event, a sufficient basis for classifying the publisher's entire operation as one in interstate commerce. It is pointed out also that the Journal's daily publication of local news and advertising was so inseparably integrated with its publication of interstate news and national advertising that any coercion used by it in securing local advertising inevitably operated to strengthen its entire operation, including its monopoly of interstate news and national advertising.

It is not necessary, however, to rely on the above suggestions. The findings go further. They expressly and unequivocally state that the publisher's conduct was aimed at a larger target—the complete destruction and elimination of WEOL. The court found that the publisher, before 1948, enjoyed a substantial monopoly in Lorain of the mass dissemination not only of local news and advertising, but of news of out-of-state events transmitted to Lorain for immediate dissemination, and of

advertising of out-of-state products for sale in Lorain. WEOL offered competition by radio in all these fields so that the publisher's attempt to destroy WEOL was in fact an attempt to end the invasion by radio of the Lorain newspaper's monopoly of interstate, as well as local commerce.[6]

There can be little doubt today that the immediate dissemination of news gathered from throughout the nation or the world by agencies specially organized for that purpose is a part of interstate commerce. *Associated Press* v. *United States,* 326 U. S. 1, 14; *Associated Press* v. *Labor Board,* 301 U. S. 103. The same is true of national advertising originating throughout the nation and offering products for sale on a national scale. The local dissemination of such news and advertising requires continuous interstate transmission of materials and payments, to say nothing of the interstate commerce involved in the sale and delivery of products sold. The decision in *Blumenstock Bros.* v. *Curtis Pub. Co.,* 252 U. S. 436, related to the making of contracts for advertising rather than to the preparation and dissemination of advertising. Moreover, the view there stated, that the making of contracts by parties outside of a state for the insertion of advertising material in periodicals of nationwide circulation did not amount to interstate commerce, rested ex-

---

[6] The reference in § 2 to an attempt to monopolize "any part of the trade or commerce among the several States" relates not merely to interstate commerce within any geographical part of the United States but also to any appreciable part of such interstate commerce. "The provisions of §§ 1 and 2 have both a geographical and distributive significance and apply to any part of the United States as distinguished from the whole and to any part of the classes of things forming a part of interstate commerce." *Indiana Farmer's Guide Pub. Co.* v. *Prairie Farmer Pub. Co.,* 293 U. S. 268, 279. See also, *United States* v. *Griffith,* 334 U. S. 100, 106; *United States* v. *Yellow Cab Co.,* 332 U. S. 218, 225; *Montague & Co.* v. *Lowry,* 193 U. S. 38.

pressly on a line of cases holding "that policies of insurance are not articles of commerce, and that the making of such contracts is a mere incident of commercial intercourse." *Id.*, at 443. See *Paul* v. *Virginia*, 8 Wall. 168, and *New York Life Ins. Co.* v. *Deer Lodge County*, 231 U. S. 495. That line of cases no longer stands in the way. *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533. See also, *North American Co.* v. *Securities & Exchange Comm'n*, 327 U. S. 686; *Indiana Farmer's Guide Pub. Co.* v. *Prairie Farmer Pub. Co.*, 293 U. S. 268.

The distribution within Lorain of the news and advertisements transmitted to Lorain in interstate commerce for the sole purpose of immediate and profitable reproduction and distribution to the reading public is an inseparable part of the flow of the interstate commerce involved. See *Binderup* v. *Pathe Exchange*, 263 U. S. 291, 309; *Stafford* v. *Wallace*, 258 U. S. 495, 516; *Illinois Central R. Co.* v. *Louisiana R. Comm'n*, 236 U. S. 157, 163; *Swift & Co.* v. *United States*, 196 U. S. 375, 398. Unless protected by law, the consuming public is at the mercy of restraints and monopolizations of interstate commerce at whatever points they occur. Without the protection of competition at the outlets of the flow of interstate commerce, the protection of its earlier stages is of little worth.

2. *The publisher's attempt to regain its monopoly of interstate commerce by forcing advertisers to boycott a competing radio station violated § 2.* The findings and opinion of the trial court describe the conduct of the publisher upon which the Government relies. The surrounding circumstances are important. The most illuminating of these is the substantial monopoly which was enjoyed in Lorain by the publisher from 1933 to 1948, together with a 99% coverage of Lorain families. Those factors made the Journal an indispensable medium of advertising for many Lorain concerns. Accordingly, its

publisher's refusals to print Lorain advertising for those using WEOL for like advertising often amounted to an effective prohibition of the use of WEOL for that purpose. Numerous Lorain advertisers wished to supplement their local newspaper advertising with local radio advertising but could not afford to discontinue their newspaper advertising in order to use the radio.

WEOL's greatest potential source of income was local Lorain advertising. Loss of that was a major threat to its existence. The court below found unequivocally that appellants' conduct amounted to an attempt by the publisher to destroy WEOL and, at the same time, to regain the publisher's pre-1948 substantial monopoly over the mass dissemination of all news and advertising.

To establish this violation of § 2 as charged, it was not necessary to show that success rewarded appellants' attempt to monopolize. The injunctive relief under § 4 sought to forestall that success. While appellants' attempt to monopolize did succeed insofar as it deprived WEOL of income, WEOL has not yet been eliminated. The injunction may save it. "[W]hen that intent [to monopolize] and the consequent dangerous probability exist, this statute [the Sherman Act], like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result." *Swift & Co.* v. *United States,* 196 U. S. 375, 396. See also, *American Tobacco Co.* v. *United States,* 328 U. S. 781; *United States* v. *Aluminum Co.,* 148 F. 2d 416, 431.

"[T]he second section [of the Sherman Act] seeks, if possible, to make the prohibitions of the act all the more complete and perfect by embracing all attempts to reach the end prohibited by the first section, that is, restraints of trade, by any attempt to monopolize, or monopolization thereof, even although the acts by which such results are attempted

to be brought about or are brought about be not embraced within the general enumeration of the first section." *Standard Oil Co.* v. *United States,* 221 U. S. 1, 61.[7]

Assuming the interstate character of the commerce involved, it seems clear that if all the newspapers in a city, in order to monopolize the dissemination of news and advertising by eliminating a competing radio station, conspired to accept no advertisements from anyone who advertised over that station, they would violate §§ 1 and 2 of the Sherman Act. Cf. *Fashion Originators' Guild* v. *Federal Trade Comm'n,* 312 U. S. 457, 465; *Binderup* v. *Pathe Exchange,* 263 U. S. 291; *Federal Trade Comm'n* v. *Beech-Nut Packing Co.,* 257 U. S. 441; *Loewe* v. *Lawlor,* 208 U. S. 274; *William Goldman Theatres* v. *Loew's, Inc.,* 150 F. 2d 738. It is consistent with that result to hold here that a single newspaper, already enjoying a substantial monopoly in its area, violates the "attempt to monopolize" clause of § 2 when it uses its monopoly to destroy threatened competition.[8]

---

[7] "Section 2 is not restricted to conspiracies or combinations to monopolize but also makes it a crime for any person to monopolize or to attempt to monopolize any part of interstate or foreign trade or commerce. . . . It is indeed 'unreasonable, *per se,* to foreclose competitors from any substantial market.' . . . The anti-trust laws are as much violated by the prevention of competition as by its destruction. . . . It follows *a fortiori* that the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful." *United States* v. *Griffith,* 334 U. S. 100, 106–107.

[8] Appellants have sought to justify their conduct on the ground that it was part of the publisher's program for the protection of the Lorain market from outside competition. The publisher claimed to have refused advertising from Elyria or other out-of-town advertisers for the reason that such advertisers might compete with Lorain concerns. The publisher then classified WEOL as the publisher's own competitor from Elyria and asked its Lorain advertisers to refuse

The publisher claims a right as a private business concern to select its customers and to refuse to accept advertisements from whomever it pleases. We do not dispute that general right. "But the word 'right' is one of the most deceptive of pitfalls; it is so easy to slip from a qualified meaning in the premise to an unqualified one in the conclusion. Most rights are qualified." *American Bank & Trust Co.* v. *Federal Bank,* 256 U. S. 350, 358. The right claimed by the publisher is neither absolute nor exempt from regulation. Its exercise as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act. The operator of the radio station, equally with the publisher of the newspaper, is entitled to the protection of that Act. *"In the absence of any purpose to create or maintain a monopoly,* the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal."* (Emphasis supplied.) *United States* v. *Colgate & Co.,* 250 U. S. 300, 307. See *Associated Press* v. *United States,* 326 U. S. 1, 15; *United States* v. *Bausch & Lomb Co.,* 321 U. S. 707, 721-723.

3. *The injunction does not violate any guaranteed freedom of the press.* The publisher suggests that the injunction amounts to a prior restraint upon what it may publish. We find in it no restriction upon any guaranteed freedom of the press. The injunction applies to a pub-

---

to employ WEOL as an advertising medium in competition with the Journal. We find no principle of law which required Lorain advertisers thus to boycott an Elyria advertising medium merely because the publisher of a Lorain advertising medium had chosen to boycott some Elyria advertisers who might compete for business in the Lorain market. Nor do we find any principle of law which permitted this publisher to dictate to prospective advertisers that they might advertise either by newspaper or by radio but that they might not use both facilities.

lisher what the law applies to others. The publisher may not accept or deny advertisements in an "attempt to monopolize . . . any part of the trade or commerce among the several States . . . ." *Associated Press* v. *United States, supra*, at 6–7, 20; *Indiana Farmer's Guide Pub. Co.* v. *Prairie Farmer Pub. Co.*, 293 U. S. 268. See also, *Oklahoma Press Pub. Co.* v. *Walling*, 327 U. S. 186, 192; *Mabee* v. *White Plains Pub. Co.*, 327 U. S. 178, 184; *Associated Press* v. *Labor Board*, 301 U. S. 103. Injunctive relief under § 4 of the Sherman Act is as appropriate a means of enforcing the Act against newspapers as it is against others.

4. *The decree is reasonably consistent with the requirements of the case and remains within the control of the court below.*[9] We have considered the objections made to the form and substance of the decree and do not find obvious error. It is suggested, for example, that the decree covers a broader scope of activities than is required by the evidence and requires unnecessary supervision of future conduct of the publisher, that notice of its terms must be published at least once a week for 25 weeks and that the publisher for five years must maintain records relating to the subject of the judgment and keep them accessible for governmental inspection.

While the decree should anticipate probabilities of the future, it is equally important that it do not impose unnecessary restrictions and that the procedure prescribed for supervision, giving notice, keeping records and making inspections be not unduly burdensome.

In the instant case the printed record contains neither the entire testimony nor all the exhibits which were before the court below. It omits also material mentioned during the trial as having been considered by the court

---

[9] A substantial part of the decree is printed in the Appendix, *infra*, pp. 157–159.

when denying the Government's motion for a temporary injunction. Under the circumstances we are content to rely upon the trial court's retention of jurisdiction over the cause for whatever modification the decree may require in the light of the entire proceedings and of subsequent events. See *Associated Press* v. *United States, supra,* at 22–23; *United States* v. *Bausch & Lomb Co., supra,* at 727–729.

The judgment accordingly is

*Affirmed.*

MR. JUSTICE CLARK and MR. JUSTICE MINTON took no part in the consideration or decision of this case.

## APPENDIX.

### "FINAL JUDGMENT— . . .

### "III

"Defendant The Lorain Journal Company is enjoined and restrained from:

"A. Refusing to accept for publication or refusing to publish any advertisement or advertisements or discriminating as to price, space, arrangement, location, commencement or period of insertion or any other terms or conditions of publication of advertisement or advertisements where the reason for such refusal or discrimination is, in whole or in part, express or implied, that the person, firm or corporation submitting the advertisement or advertisements has advertised, advertises, has proposed or proposes to advertise in or through any other advertising medium.

"B. Accepting for publication or publishing any advertisement or making or adhering to any contract for the publication of advertisements on or accompanied by any

condition, agreement or understanding, express or implied:

> "1. That the advertiser shall not use the advertising medium of any person, firm or corporation other than defendant The Lorain Journal Company;
> "2. That the advertiser use only the advertising medium of defendant The Lorain Journal Company;

"C. Cancelling, terminating, refusing to renew or in any manner impairing any contract, agreement or understanding, involving the publication of advertisements, between the defendants, or any of them, and any person, firm or corporation for the reason, in whole or in part, that such person, firm or corporation advertised, advertises or proposes to advertise in or through any advertising medium other than the newspaper published by the corporate defendant.

## "IV

"Commencing fifteen (15) days after the entry of this judgment and at least once a week for a period of twenty-five weeks thereafter the corporate defendant shall insert in the newspaper published by it a notice which shall fairly and fully apprise the readers thereof of the substantive terms of this judgment and which notice shall be placed in a conspicuous location.

## "V

"Defendant The Lorain Journal Company and the individual defendants are ordered and directed to:

"A. Maintain for a period of five (5) years from the date of this judgment, all books and records, which shall include all correspondence, memoranda, reports and other writings, relating to the subject matter of this judgment;

"B. Advise in writing within ten (10) days from the date of this judgment any officers, agents, employees, and

any other persons acting for, through or under defendants or any of them of the terms of this judgment and that each and every such person is subject to the provisions of this judgment. The defendants shall make readily available to such persons a copy of this judgment and shall inform them of such availability.

## "VII

"Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this judgment to apply to the Court at any time for such further orders and directions as may be necessary or appropriate in relation to the construction of, or carrying out of this judgment, for the amendment or modification of any of the provisions thereof, or the enforcement of compliance therewith and for the punishment of violations thereof."