**KLOR'S, INC., Appellant,**

v.

**BROADWAY–HALE STORES, INC.,**
et al., Appellees.

No. 15380.

United States Court of Appeals
Ninth Circuit.
March 28, 1958.

Irvin Goldstein, Maxwell Keith, San Francisco, Cal., for appellant.

Brobeck, Phleger & Harrison, Moses Lasky, San Francisco, Cal., for appellee Broadway-Hale Stores, Inc.

Herbert W. Clark, Morrison, Foerster, Holloway, Shuman & Clark, San Francisco, Cal., for appellees Admiral Corp., Admiral Distributors, Inc., Tappan Stove Co., and O'Keefe & Merritt Co.

Robert E. Burns, San Francisco, Cal., Joseph S. Wright, Edward McCausland, Chicago, Ill., for appellee Zenith Radio Corp.

Claude N. Rosenberg, Bacigalupi, Elkus & Salinger, San Francisco, Cal., for appellee Whirlpool-Seeger Corp.

David B. Gideon, Gibbs & Gideon, San Francisco, Cal., for appellee H. R. Basford Co.

John A. Sutro, Pillsbury, Madison & Sutro, San Francisco, Cal., for appellee Radio Corp. of America.

H. W. Glensor, San Francisco, Cal., for appellee Leo J. Meyberg Co.

Gavin, McNab, Schmulowitz, Sommer & Wyman, San Francisco, Cal., for appellees Emerson Radio & Phonograph Corp. and Jefferson-Travis, Inc.

Garrett McEnerney, II, McEnerney & Jacobs, San Francisco, Cal., for appellees Philco Corp. and Philco Distributors, Inc.

Herbert E. Hall, John D. Gallaher, San Francisco, Cal., for appellee Rheem Mfg. Co.

Everett A. Mathews, Cooley, Crowley, Gaither, Godward, Castro & Huddleson, San Francisco, Cal., for appellees General Electric Co. and General Electric Distributing Corp.

Philip S. Ehrlich, Irving Rovens, San Francisco, Cal., for appellees Olympic Radio & Television, Inc. and Olympic Television of Northern Cal.

Before DENMAN, BARNES and HAMLEY, Circuit Judges.

BARNES, Circuit Judge.

*I. The Private Plaintiff in Anti-Trust Litigation.*

Section 4 of the Clayton Act provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * and shall recover threefold the damages by him sustained." 15 U.S.C.A. § 15.

Passing for the present an examination of what "thing" is forbidden, we note a tendency in some courts to narrow the apparent scope of this statute due to concern with the severity of the penalty.[1]

In a recent case this Court said: "A niggardly construction of the treble damage provisions would do violence to the clear intent of Congress. The private antitrust action is an important and effective method of combating unlawful and destructive business practices. The private suitor complements the Government in enforcing the antitrust laws. The treble damage provision was designed to foster and stimulate the interest of private persons in maintaining a free and competitive economy. Its efficacy should not be weakened by judicial construction." Flintkote Co. v. Lysfjord, 246 F.2d 368, 398, certiorari denied, 1957, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46.

Of more importance is what the Supreme Court has said. In reversing an antitrust case from this Circuit in 1957, that Court admonished the trial and appellate federal courts that:

"Petitioner's claim need only be 'tested under the Sherman Act's general prohibition on unreasonable restraints of trade,' [citing cases] and meet the requirement that petitioner has thereby suffered injury."[2]

With these principles in mind, we proceed to an examination of what is forbidden by the antitrust laws, as stated in Section 4 of the Clayton Act.

The Sherman Act's first and second sections are relied on by the pleadings in this case.[3]

1. Snow Crest Beverages, Inc., v. Recipe Foods, Inc., D.Mass.1956, 147 F.Supp. 907, 909; Harrison v. Paramount Pictures, Inc., E.D.Penn.1953, 115 F. Supp. 312; Cf.: Congress Bldg. Group v. Loews, Inc., 7 Cir., 1957, 246 F.2d 587.

2. Radovich v. National Football League, 1957, 352 U.S. 445, 453, 77 S.Ct. 390, 395, 1 L.Ed.2d 456: "Congress has, by legislative fiat, determined that such prohibited activities are injurious to the public and has provided sanctions allowing private enforcement of the antitrust laws by an aggrieved party. These laws protect the victims of the forbidden practices as well as the public. [Citing cases.] Furthermore, Congress itself has placed the private antitrust litigant in a most favorable position through the enactment of § 5 of the Clayton Act [15 U.S.C.A. § 16]. [Citing cases.] In the face of such a policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws." Ibid.

3. 15 U.S.C.A. § 1: "Every contract, combination in the form of trust or other-

Does the Sherman Act mean *every* contract, and *every* restraint, or must it be interpreted? Must it be aided by a Rule of Reason, and if so, what is that Rule of Reason? The problem is not a new one, nor is it easy. Not only do competent judges disagree—they frequently reach similar destinations by differing circuitous routes.[4]

▬ Suffice it to say that from a period shortly after the early pronouncements of our Supreme Court which made the Sherman Act a comparatively dead law,[5] succeeding Supreme Court Justices have found it necessary to interpret the precise language used in the Act and determine its proper construction.[6] Even such a "literalist" as Mr. Justice Peckham eventually came to that view,[7] at least with regard to what constituted interstate commerce, even if he could not agree with Mr. Justice White[8] on what was meant by "every restraint." And, although the statutory language "is literally all encompassing, the courts have construed it as precluding only those contracts or combinations which 'unreasonably' restrain competition." [8a]

With this brief introduction, let us turn to the pleadings and evidence of this case.

wise, or conspiracy in restraint of trade or commerce among the several States * * * is declared to be illegal * *." 15 U.S.C.A. § 2: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce * * * shall be deemed guilty of a misdemeanor * * *."

4. "Unity of decision does not always require unity of theory." Handler, Antitrust in Perspective 11 (1957).

5. See, e. g., United States v. E. C. Knight Co., 1895, 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325.

6. Compare United States v. Joint Traffic Association, 1898, 171 U.S. 505, 567–568, 19 S.Ct. 25, 43 L.Ed. 259, with United States v. Trans-Missouri Freight Ass'n, 1897, 166 U.S. 290, 312, 17 S.Ct. 540, 41 L.Ed. 1007, where similar contracts with similar purposes (design to fix freight rates) were under consideration.

7. "The act of congress must have a reasonable construction, or else there would scarcely be an agreement or contract among businessmen that could not be said to have, indirectly or remotely, some bearing upon interstate commerce, and possibly to restrain it." Hopkins v. United States, 1898, 171 U.S. 578, 600, 19 S.Ct. 40, 48, 43 L.Ed. 290.

8. Professor Handler tells how Mr. Justice White "avoided the embarrassment of the word 'every' in two ways. First, he regarded the Sherman Act as codifying the common law and * * * embodying the same rule of reason sanctioned by prior law. 16/ (United States v. Trans-Missouri Freight Asso., 1897,

[166 U.S.] 290, 353–356 [17 S.Ct. 540, 41 L.Ed. 1007].) Second, he asserted that the phrase 'restraint of trade,' both in the prior decisions and the statute, signified illicit arrangements only. 17/ (Id. [166 U.S.] at [pages] 345–352 [17 S.Ct. at pages 560–563].) Under this view, if an agreement was reasonable, it was not in restraint of trade. According to White's theory, the rule of reason had been built into the very words and structure of the legislation. * * *
White * * * in his Standard Oil and American Tobacco (United States v. American Tobacco Co., 1911, 221 U.S. 106 [31 S.Ct. 632, 55 L.Ed. 663]) opinions * * * by this strained rationale * * * finally succeeded in introducing a rule of reason into our antitrust jurisprudence. * * *
Under (Mr. Justice) Taft's view, there was no place for a rule of reason where the restrictions on competition were nonancillary. * * *
* * * [T]he English courts had * * * abandoned the initial rule of total invalidity (of restraints of trade) and enforced agreements not to compete when ancillary to some major lawful purpose and reasonable in duration and extent. * * *
* * * [C]ommon law * * * did not employ the phrase 'restraint of trade' synonymously with illegality." Handler, Antitrust in Perspective, 11 (1957).

8a. Northern Pacific Railway Co. v. United States, 1958, 355 U.S. 649, 651, 78 S.Ct. 514, 518, citing Standard Oil Co. of New Jersey v. United States, 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, and Chicago Board of Trade v. United States, 1918, 246 U.S. 231, 38 S.Ct. 242, 62 L. Ed. 683.

## II. The Pleadings.

Plaintiff corporation sues many defendants, claiming a cause of action under Sections 4 and 16 of the Clayton Act,[9] by reason of defendants' alleged violation of Sections 1 and 2 of the Sherman Act.[10]

The complaint alleges plaintiff is the owner and operator of a retail store engaged in the business in San Francisco of selling radios, television sets, clothes washers, refrigerators, electric and gas stoves, phonographs and various electrical appliances. Plaintiff charges defendant Broadway-Hale Stores, Inc., a corporation, is a competitor in the purchase and sale of such household appliances, operating a chain of stores in the western states and one specific store in the general vicinity of plaintiff's retail store in the Mission District area of San Francisco, California. The eighteen other defendants named are ten leading manufacturers[11] and eight distributors[12] of such household appliances mentioned above.

Plaintiff charges that all defendants beginning prior to 1952 "have restrained trade and commerce in the interstate distribution and sale" of the described types of goods in the San Francisco area "by contracting, combining, conspiring together, and each with the other in restraint and monopoly of such trade and commerce" and "have substantially lessened, limited, and restrained competition in said trade and commerce." [13]

---

9. Title 15 U.S.C.A. §§ 15, 26.

10. Title 15 U.S.C.A. §§ 1, 2.

11. Admiral Corporation; Zenith Radio Corporation; Whirlpool-Seeger Corporation; Radio Corporation of America; Emerson Radio and Phonograph Corporation; Philco Corporation; Rheem Manufacturing Company; General Electric Company; Olympic Radio and Television, Inc.; and Tappan Stove Company.

12. Admiral Distributors, Inc.; H. R. Basford Company; Leo J. Meyberg; Jefferson-Travis, Inc.; Philco Distributors, Inc.; General Electric Dist. Corporation; Olympic Television of Northern California; and O'Keefe and Merritt Company.

13. Plaintiff's pertinent allegations were: " * * * 6. * * * Beginning at a period prior to 1952, and continuing uninterrupted up to and including the date of filing this complaint, the defendants, all well knowing the facts herein alleged, have restrained trade and commerce in the interstate distribution and sale of radios, television sets, clothes washers and dryers, refrigerators, electric and gas ranges, phonographs and electric appliances in the San Francisco Bay Area, by contracting, combining, conspiring together, and each with the other, in restraint and monopoly of such trade and commerce contrary to Sections 1 and 2 of the Act of Congress * * * 15 U.S.C.A., Sections 1 and 2, and have thereby substantially lessened, limited and restrained competition in said trade and commerce, and have prevented plaintiff from obtaining (the above articles) for resale; and have discriminated against plaintiff and in favor of plaintiff's competition in the sale and distribution of the products; and have refused to sell to or enter into any contract to sell products to plaintiff. Such combination, conspiracy and agreement tend to and do actually restrain and monopolize interstate commerce in the distribution and sale of (the listed products) in favor of Hale. More particularly, the manufacturer-distributor defendants in pursuing a policy in favor of Hale and against plaintiff have done and are continuing to do the following acts:" There then follows a list of nine particular acts which defendants are alleged to have done, all directed solely at plaintiff and in favor of the defendant Broadway-Hale. * * *

"8. The defendant Hale operates a chain of key stores in the west coast area of the United States. It enjoys a monopolistic buying power by reason of the large number of retail outlets it operates. It has used its monopolistic buying power to negotiate terms and conditions of acquisition and purchase of the products manufactured, distributed and sold by the manufacturer-distributor defendants. It has used its monopolistic buying power to deny to plaintiff its competitive position in the acquisition, purchase and sale of the products manufactured, distributed and sold by the manufacturer-distributor defendants and, in particular, has purchased and continues to purchase the products of the manufacturer-distributor defendants upon the condition that the manufacturer-dis-

Various alleged discriminations in sale, supply, price terms, etc., are charged in count one of the complaint as part of the conspiracy. Counts two through thirty-one charge violations of the Robinson-Patman Act [14] and counts thirty-two through forty-one charge violations of § 13(f) of the Robinson-Patman Act [15] —discrimination in price, services, etc.

### III. Proceedings in the District Court.

By pre-trial order count one was limited to a single conspiracy charging a Sherman Act violation.[16]

Subsequently, under Federal Rules of Civil Procedure 42(b), 28 U.S.C.A., the trial court ruled:

"Count one of the complaint and the claim for relief tendered thereby are to be treated in all respects as if they constituted a separate action."

All but one of the defendants (18 of 19) then moved to dismiss count one of the complaint,

---

tributor defendants do not sell their products to the plaintiff. The manufacturer-distributor defendants have dealt with Hale throughout the period of time alleged on a chain basis and have manufactured, distributed and sold products for resale in the San Francisco Bay Area in consideration of manufacturing, distributing and selling the products to Hale for resale in other parts of the West Coast area of the United States. * * *

"9. By reason of the monopoly buying power of defendant Hale, and the illegal and discriminatory tactics, combinations, conspiracies and agreements in restraint of trade by the manufacturing-distributor defendants acting in collaboration, the business of plaintiff has been seriously impaired, injured and damaged, and the plaintiff has suffered great damage in loss of profits, good will, reputation and prestige of its store as a retail dealer in (the listed products). Plaintiff has been paying unreasonable and discriminatory prices and has been subjected to unfair, unreasonable and discriminatory practices to the damage and loss of plaintiff and to the advantage of defendants, all by reason of the defendants' violation of the anti-trust laws."

14. Title 15 U.S.C.A. § 13(a), (d) and (e).

15. Title 15 U.S.C.A. § 13(f).

"* * * for failure to state a claim upon which relief can be granted, and for summary judgment on said Count One on the ground that there is no genuine issue as to any material fact and the moving parties are entitled to a judgment as a matter of law."

In support of this motion, the moving parties submitted a dozen affidavits. Appellant stood on the pleadings and papers on file, filing no documents in opposition to the motion. It should be noted here that the court below did not rule on the pleadings nor grant the motion to dismiss by reason of any failure therein. While a motion to dismiss was made, it was apparently passed over so that the motion for summary judgment could be determined. That latter motion having been granted, it was necessarily dispositive of the motion to dismiss.

The District Court granted the motion for summary judgment by preliminary order and subsequent formal judgment.[17]

---

16. "1(a) * * * Count one of the Complaint is and shall in all further proceedings be interpreted and construed as one seeking relief solely with respect to a conspiracy under the Sherman Act * * * and not as seeking to assert any claim for relief under the Robinson-Patman Act. * * *

"(b) Count one of the Complaint is amended by striking the words 'combinations, conspiracies and agreements' in paragraph 9, * * * and substituting the words 'combinations, conspiracy and agreement'. * * *" (Tr. p. 20.)

17. "The Court having heretofore on June 8, 1956 and on June 22, 1956 made its orders for separate trials by virtue of which Count One of the complaint and the claim for relief tendered thereby are to be treated in all respects as if they constituted a separate action, and defendants having thereafter severally moved to dismiss Count One of the complaint and the claim for relief tendered thereby and for summary judgment thereon, and it appearing that there is no genuine issue of fact respecting the claim for relief tendered by said Count One,

It Is Hereby Ordered, Adjudged and Decreed that said motions to dismiss and said motions for summary judgment are and each of them hereby is granted, and

The preliminary order is short, and reads as follows:

"It appears from the allegations of count one of the complaint and from the undisputed affidavits supporting the motion for summary judgment that there is no genuine issue of fact respecting the claim for relief tendered by count one of the complaint.

"Count one is not a cause of action under the Sherman Anti-Trust Act. It is not concerned with private damages caused by a public wrong proscribed by the Act.

"It is just the case of a retail store in the Mission District of San Francisco—one of hundreds in the city engaged in selling the same kind of merchandise—which has a plaint that certain supplier defendants won't sell it some merchandise, allegedly at the behest of one of its competitors. It is purely a private quarrel, (perhaps otherwise legally remediable) arising out of some undisclosed cause—the nature of which we may suspect, but do not know.

"There is not the slightest basis either in substantiality or law for the exercise of our jurisdiction.

"The motions are granted. * * *"

This appeal is from the motion granting summary judgment. Count one alone is involved. The other forty counts are not before us.

### IV. The Issues.

Appellant makes but one specification of error—namely, that it was error to grant a motion for judgment or dismiss a complaint seeking damages under § 4 of the Clayton Act based upon an alleged violation of the Sherman Act plus consequent damage to plaintiff because the complaint had failed to allege and plaintiff had failed to prove, as an additional element, a "public injury."

Appellees do not agree that the trial court's action (and alleged error) can be so described. They agree that if there has been alleged a violation of the Sherman Act, plus consequent damage to a private plaintiff, a cause of action is stated. They claim a violation of the Sherman Act was not pleaded, and more important, not established by the evidence before the court on the motion to dismiss. This was because the restraint of trade relied on was not a restraint of trade recognized as such at common law which constitutes a per se violation of the Sherman Act; and in the absence of such a type of violation, there must be alleged a restraint, injurious to the public if proved, in order to constitute an actionable violation of the Sherman Act, either in pleading or proof. The question before the trial court, say appellees, and now here, is this:

"(1) Is the charged restraint of trade of a kind falling within the purview of the Sherman Act?"

and secondarily,

"(2) Does the conspiracy have the necessary relation to interstate commerce?"

Both questions must be answered affirmatively, say appellees, before appellant can prevail.

To put it another way, appellant contends that *any* contract, combination or conspiracy which restrains trade or commerce, no matter in what degree and no matter against whom or how many persons similarly situated the restraint is directed, *always* violates the Sherman Act proscription.

Appellant argues that

"[T]he public in any part of interstate commerce is entitled to the competition of *all* traders and the

---

that said Count One and the claim for relief tendered thereby be and they are hereby dismissed as to each and every defendant, and that plaintiff take nothing by them, and the Court hereby expressly determines that there is no just reason for delay in the entry of the foregoing judgment and the clerk is hereby expressly directed to enter the foregoing judgment forthwith. * * *" [Tr. pp. 135, 136.]

public interest is *necessarily* impaired when *a* trader is eliminated. * * * The antitrust laws are a trader's statute which protect the trader from unlawful conduct in restraint of trade in order to insure that the public obtains a true competitive market."[18]

Appellees, on the other hand, contend with equal vigor that not every restraint upon a single competitor is a restraint of trade or commerce within the meaning of the Sherman Act. They argue, in essence, that a plaintiff, in order to succeed on this motion for summary judgment must allege in his complaint (if he is willing to rely solely upon it in opposition to appellees' affidavits) sufficient facts to prove, or from which it may be inferred, that the public as a whole is or may be in some way affected by the defendants' conduct; i.e., that the conduct attacked has some *substantial* effect on the particular relevant market involved.

Appellant quotes at length from, and largely relies upon, both the briefs filed and the opinion rendered in Radovich v. National Football League,[19] certain motion picture antitrust cases, e.g. such as United States v. Paramount Pictures, 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed.

1260; United States v. Schine Chain Theatres, 1948, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245; United States v. Griffith, 1948, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236; Bigelow v. R.K.O. Radio Pictures, 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Binderup v. Pathé Exchange, 1923, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; Hart v. B. F. Keith Vaudeville Exchange, 1923, 262 U.S. 271, 43 S. Ct. 540, 67 L.Ed. 977, and pleadings cases like United States v. Employing Plasterers Ass'n, 1954, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618.

It is appellant's position that "Radovich * * * overruled this court and thus overruled its principal supports, Fedderson[20] and Shotkin."[21]

Appellees urge that they have carefully maneuvered around the pitfall of a motion to dismiss premised on the pleadings; that they have filed twelve affidavits uncontradicted by anything other than the complaint, as amended by pre-trial order;[22] that the court passed on an "undisputed factual situattion;"[23] and, that the trial court's finding and the summary judgment based thereon is required by §§ 1 and 2 of the Sherman Act, as interpreted by the Supreme Court, particularly in Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469,

---

18. Appellant's Opening Brief, p. 7. (Emphasis added.)

19. 1957, 352 U.S. 445, 77 S.Ct. 390, 1 L. Ed.2d 456.

20. 10 Cir., 1950, 180 F.2d 519.

21. 10 Cir., 1948, 171 F.2d 236.

22. The voluntary amendment of the complaint as to damages is here immaterial.

23. "The Court: You're really relying, then, on not so much the motion to dismiss as on the motion for summary judgment.
"Mr. Lasky: I think it's a motion for summary judgment.
"The Court: You are stating that as a matter of fact that a case is not stated because of an undisputed factual situation. * * *
"Mr. Goldstein: May it please the Court, the conspiracy charged in count one of the complaint is this: No matter

how counsel may attempt to avoid it, no matter how abstruse are some of his deductions, it does amount to this and on which the plaintiff rests his case. * *
"The Court: Well, all that I was endeavoring to do, Mr. Goldstein, was to get the question down to a somewhat simple basis. The private right in antitrust arises out of the private damage because of the public wrong.
"Mr. Goldstein: Yes, sir.
"The Court: In other words, it doesn't arise out of a private wrong; it arises out of a public wrong.
"Mr. Goldstein: There must be, as I have conceded, there must be some public interest.
"The Court: And the private individual where there is a public wrong has only a cause of action when he can show that the public wrong caused him some damage.
"Mr. Goldstein: Yes, sir. * * *"
[Tr. pp. 145, 146.]

60 S.Ct. 982, 84 L.Ed. 1311, and those cases which are claimed to follow it.

### V. The Facts.

The facts, as set forth in the affidavits, and undisputed by appellant, were summarized by appellees as follows:

"Appellant and appellee Hale are not the only retailers of appliances in San Francisco. There are literally hundreds, if not thousands, of others (R. 25–27). The classified section of the San Francisco Telephone Directory contains 14 pages of listings (R. 29–43). In San Francisco alone are sold not only the brands of appliances involved in this case but many other competing brands (R. 26–27). In addition to the 7 brands of television sets, radio and phonographs mentioned in the complaint, there are 20 other competing brands sold in San Francisco. In addition to the three mentioned brands of refrigerators there are 18 other competing brands. In addition to the 5 mentioned brands of stoves, there are 23 competing brands; in addition to the 2 mentioned brands of clothes washers and dryers, there are 30 competing brands. Among these competing brands are many of the outstanding and most widely advertised brands in the country, including the names Capehart, Crosley, Du Mont, Hallicrafter, Hoffman, Magnavox, Motorola, Packard-Bell, Scott, Westinghouse, Amana, Bendix, Coldspot, Frigidaire, Hotpoint, International Harvester, Kelvinator, Norge, Servel, Chambers, Roper, Thermador, Western Holly (see listing at R. 26–27). Appellant does not charge that he was denied the right to handle any of this vast number of brands manufactured and sold by companies not parties to this action.

"Moreover, a large number of other retailers sell to the San Francisco public the very brands referred to in the complaint. At the date of filing suit the number of dealers *in San Francisco* handling these products was as follows. (See note[24].)

In the *Mission District alone*, in San Francisco, there are 53 dealers selling the brands referred to in the complaint. Restricting the area under consideration even more narrowly, *to Mission street alone,* a member of the public desiring to purchase an appliance and strolling down Mission Street for a span of but 11 blocks, of which appellant's store is approximately in the center, would pass the shops of 43 retailers, selling the specific items and brands referred to in the complaint. Defendants' Exhibit A on the motion (R. 146) is a chart bringing together the factual data taken from the 12 affidavits. * * *

"Finally, it may be noted that while the alleged conspiracy is charged as having begun prior to 1952 (R. 9), the number of retail stores in San Francisco selling the items and brands referred to in the

24. "Admiral products ............................ 195 retailers (R. 45)
Zenith products ............................ 153 retailers (R. 48)
Whirlpool products ........................ 67 retailers (R. 50)
RCA products ............................. 127 retailers (R. 52)
Emerson products ......................... 109 retailers (R. 54)
Philco products ........................... 175 retailers (R. 58)
Rheem products ........................... 56 retailers (R. 62)
GE products .............................. 110 retailers (R. 66)*
Olympic products ......................... 33 retailers (R. 116)
Tappan products .......................... 13 retailers (R. 118)
O'Keefe & Merritt products ................ 65 retailers (R. 121)

* The figure given is for GE television dealers. The figure for GE major appliance dealers is 54 and for dealers in GE radios and traffic appliances it is 463."

complaint steadily increased after 1952 and up to the time of the commencement of the suit. Admiral dealers increased from 150 to 195, and in the Mission District alone from 20 to 36; Zenith from 120 to 153; Whirlpool dealers from 40 to 47; Emerson from 40 to 109 and in the Mission District alone from 13 to 29; Philco from 79 to 175 and in the Mission District alone from 22 to 47; Wedgewood Stove dealers from 41 to 56 and from 8 to 9 in the Mission District alone; General Electric dealers and RCA have run into the hundreds for years and there have been no material variations. (This data appears in the 12 affidavits, R. 25 to 125)."

## VI. The Law.

■ Apex Hosiery Co. v. Leader, supra, teaches that not every restriction on commerce is a restraint of trade within the meaning of the Sherman Act.

■ First, the restraint must "occur in or affect commerce between the states * * * for constitutional reasons." Id., 310 U.S. at page 498, 60 S.Ct. at page 995.

■ We need not concern ourselves here with the substantiality of the amount of commerce involved. Apex tells us "it is the nature of the restraint and its effect on interstate commerce and not the amount of the commerce which are the tests of violation." Id., 310 U.S. at page 485, 60 S.Ct. at page 987.[25]

Second, "the restraints at which the Sherman law is aimed, and which are described by its terms *are only those which are comparable to restraints deemed illegal at common law * * *.*"

[Emphasis added.] Id., 310 U.S. at page 498, 60 S.Ct. at page 995. The drafters of the Sherman Act "extended the condemnation of the statute to restraints effected by any combination in the form of trust or otherwise, or conspiracy, as well as by contract or agreement, having those effects on the competitive system and on purchasers and consumers of goods or services which were characteristic of restraints deemed illegal at common law * * *." Ibid.

In deciding the question of whether a conspiracy of workers to stop factory production was "the kind of restraint of trade or commerce at which the Act is aimed,"[26] the Supreme Court in Apex had the same question (in different form) to answer as is here raised by the motion to dismiss. It is to be remembered that in Apex this question was required to be answered "even though a natural and probable consequence of their (the strikers') acts and the only effect on trade or commerce was to prevent substantial shipments interstate by the employer."[27]

"The critical words which circumscribe the judicial performance of this function so far as the present case is concerned are 'Every * * * combination * * * or conspiracy, in restraint of trade or commerce.' Since in the present case, as we have seen, the natural and predictable consequence of the strike was the restraint of interstate transportation *the precise question which we are called upon to decide is whether that restraint* resulting from the strike maintained to enforce union demands by compelling a shutdown of petitioner's factory *is the kind of*

25. Citing United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 225, 60 S.Ct. 811, 84 L.Ed. 1129. See, also, Times-Picayune Pub. Co. v. United States, 1953, 345 U.S. 594, 611, 73 S. Ct. 872, 97 L.Ed. 1277; Lorain Journal Co. v. United States, 1951, 342 U.S. 143, 151, note 6, 72 S.Ct. 181, 96 L.Ed. 162; United States v. Paramount Pictures, 1948, 334 U.S. 131, 173, 68 S.Ct.

915, 92 L.Ed. 1260; United States v. Yellow Cab Co., 1947, 332 U.S. 218, 225–226, 67 S.Ct. 1560, 91 L.Ed. 2010.

26. Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 487, 60 S.Ct. 982, 988, 84 L.Ed. 1311.

27. Ibid.

*'restraint of trade or commerce'*
*which the Act condemns."*[28]

The court then traces some of the background of the Sherman Act and states:

"The end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public injury.[29]

"For that reason the phrase 'restraint of trade' which, as will presently appear, had a well-understood meaning at common law, was made the means of defining the activities prohibited. The addition of the words 'or commerce among the several States' was not an additional kind of restraint to be prohibited by the Sherman Act but was the means used to relate the prohibited restraint of trade to interstate commerce for constitutional purposes, Atlantic Cleaners & Dyers v. United States, 286 U.S. 427, 434, 52 S.Ct. 607, 609, 76 L.Ed. 1204, so that Congress, through its commerce power, might suppress and penalize restraints on the competitive system which involved or affected interstate commerce."[30]

In Apex Justice Stone went on:

"The common law doctrines relating to contracts and combinations in restraint of trade were well understood long before the enactment of the Sherman Law. They were contracts for the restriction or suppression of competition in the market, agreements to fix prices, divide marketing territories, apportion customers, restrict production and the like practices, which tend to raise prices or otherwise take from buyers

or consumers the advantages which accrue to them from free competition in the market. * * *

"In seeking more effective protection of the public from the growing evils of restraints on the competitive system effected by the concentrated commercial power of 'trusts' and 'combinations' at the close of the nineteenth century, the legislators found ready at their hand the common law concept of illegal restraints of trade or commerce. In enacting the Sherman law they took over that concept by condemning such restraints wherever they occur in or affect commerce between the states. They extended the condemnation of the statute to restraints effected by any combination in the form of trust or otherwise, or conspiracy, as well as by contract or agreement, having those effects on the competitive system and on purchasers and consumers of goods or services which were characteristic of restraints deemed illegal at common law, and they gave both private and public remedies for the injuries flowing from such restraints.

"That such is the scope and effect of the Sherman Act was first judicially recognized and expounded in the classic opinion in United States v. Addyston Pipe & Steel Co., 6 Cir., 85 F. 271, 46 L.R.A. 122, affirmed 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136, written by Judge, later Chief Justice Taft, and concurred in by Justice Harlan and Judge, later Justice Lurton, of this Court. This Court has since repeatedly recognized that the restraints at which the Sherman law is aimed, and which are described by its terms, are only those which are comparable to restraints deemed illegal at common law, although accomplished by means

28. Id., 310 at page 490, 60 S.Ct. at page 990. (Emphasis added.)

29. Id., 310 U.S. at page 493, 60 S.Ct. at page 992.

30. Id., 310 U.S. at pages 494–495, 60 S. Ct. at page 992.

other than contract and which, for constitutional reasons, are confined to transactions in or which affect interstate commerce.

"* * * In thus grounding the 'rule of reason' upon the analogy of the common law doctrines applicable to illegal restraints of trade the Court gave a content and meaning to the statute in harmony with its history and plainly indicated by its legislative purpose. Labor cases apart, which will presently be discussed, this Court has not departed from the conception of the Sherman Act as affording a remedy, public and private, for the public wrongs which flow from restraints of trade in the common law sense of restriction or suppression of commercial competition. In the cases considered by this Court since the Standard Oil case in 1911 some form of restraint of commercial competition has been the sine qua non to the condemnation of contracts, combinations or conspiracies under the Sherman Act, and in general restraints upon competition have been condemned only when their purpose or effect was to raise or fix the market price. It is in this sense that it is said that the restraints, actual or intended, prohibited by the Sherman Act are only those which are so substantial as to affect market prices. Restraints on competition or on the course of trade in the merchandising of articles moving in interstate commerce is (sic) not enough, unless the restraint is shown to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition. (Citations omitted.)

"* * * Here it is plain that the combination or conspiracy did not have as its purpose restraint upon competition in the market for peti-

tioner's product. Its object was to compel petitioner to accede to the union demands and an effect of it, in consequence of the strikers' tortious acts, was the prevention of the removal of petitioner's product for interstate shipment. So far as appears the delay of these shipments was not intended to have and had no effect on prices of hosiery in the market, and so was in that respect no more a restraint forbidden by the Sherman Act than the restriction upon competition and the course of trade held lawful in Appalachian Coals v. United States, supra [228 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825], because notwithstanding its effect upon the marketing of the coal it nevertheless was not intended to and did not affect market price." [31]

Radovich v. National Football League, 9 Cir., 1956, 231 F.2d 621, 623, was a pleading case. In it, this Court decided on two grounds that plaintiff's complaint did not state a cause of action. The first ground was that football was more like baseball (Toolson v. New York Yankees, 1953, 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64; Federal Base Ball Club of Baltimore v. National League, 1922, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898) than like boxing (United States v. International Boxing Club, 1955, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290). Secondly, if wrong on the first premise, then Radovich's complaint did not "allege facts from which it can be determined as a matter of law that by reason of intent, tendency, or the inherent nature of the contemplated acts, the conspiracy was reasonably calculated to prejudice the public interest by unduly restricting the free flow of interstate commerce," quoting from Fedderson Motors v. Ward, 10 Cir., 1950, 180 F.2d 519, 522.

Radovich alleged that there was a conspiracy to eliminate football leagues not affiliated with the defendant, hence, defendants were creating a monopoly. The

31. Id 310 U.S. at pages 497–502, 60 S.Ct. at pages 994–997.

method alleged was to control the players by the "reserve clause" and "blacklists." The alleged intent of the defendants in Radovich was to "boycott and ruin [defendant's competitor] the All America Conference." This Court concluded that the means alleged were not calculated to prejudice the public or unreasonably restrain interstate commerce. This Court failed "to discover any basis to say that the appellant has pleaded that All America or any other league was ruined, would be ruined or substantially affected by the complained of acts," and therefore felt there were no facts pleaded leading to the conclusion that the public had been adversely affected.

The Supreme Court (352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456) considered both grounds relied on by this Court to affirm the District Court and found them untenable. We are not concerned here with the Supreme Court's refusal to approve this Court's conclusion as to the similarity between football and baseball. But appellant herein strongly relies upon the pronouncement of the Supreme Court with respect to the second point: public injury. After disposing of the essential allegations of the substantial effect upon interstate commerce, the Supreme Court said:

"We find the technical objections to the pleading without merit. The test as to sufficiency laid down by Mr. Justice Holmes in Hart v. B. F. Keith Vaudeville Exchange, 1923, 262 U.S. 271, 274, 43 S.Ct. 540, 541, 67 L.Ed. 977, is whether 'the claim is wholly frivolous.' While the complaint might have been more precise in its allegations concerning the purpose and effect of the conspiracy, 'we are not prepared to say that nothing can be extracted from this bill that falls under the Act of Congress * * *.' Id., 262 U.S. at page 274, 43 S.Ct. at page 541." [32]

The Court then cites United States v. Employing-Plasterers Association, supra, which again is a pleading case.

The Supreme Court then states:

"Petitioner's claim need only be 'tested under the Sherman Act's general prohibition on unreasonable restraints of trade,' Times-Picayune Pub. Co. v. U. S., 1953, 345 U.S. 594, 614, 73 S.Ct. 872, 883, 97 L.Ed. 1277, and meet the requirement that petitioner has thereby suffered injury. Congress has, by legislative fiat, determined that such prohibited activities are injurious to the public [10] and has provided sanctions allowing private enforcement of the antitrust laws by an aggrieved party. These laws protect the victims of the forbidden practices as well as the public." [33]

The Supreme Court, by Note 10 and reference to its earlier decision in Apex, defines what it means by "prohibited activities are injurious to the public" and what the "forbidden practices" are from which the public is to be protected. Note 10 reads as follows:

"In Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, this Court said: 'The end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of the purchasers or consumers of goods and services, *all of which had come to be regarded as a special form of public injury.*' (Emphasis supplied.) Id., 310 U.S. at page 493, 60 S.Ct. at page 992." [34]

To further emphasize the restriction to free competition to which it referred, the Supreme Court continued its Note 10 as follows:

---

32. Radovich v. National Football League, 1957, 352 U.S. 445, 453, 77 S.Ct. 390, 395, 1 L.Ed.2d 456.

33. Ibid. 352 U.S. 454, 77 S.Ct. 395.

34. It is to be noted that the emphasis supplied in the foregoing quotation by the Supreme Court of its earlier decisions in Apex, was supplied by that Court, not by this Court.

"In Standard Sanitary Mfg. Co. v. United States, 1912, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107, speaking of the antitrust laws the Court said: *'The law is its own measure of right and wrong,* of what it permits or forbids, and *the judgment of the courts cannot be set up against it* in a supposed accommodation of its policy with the good intention of parties, and, it may be, of some good results.' Emphasis supplied. Id., 226 U.S. at page 49, 33 S.Ct. at page 15." [35]

We take it that by this Note the Supreme Court admonishes the inferior courts not to come to their own philosophical conclusions as to what restraints of trade should be prohibited, contrary to the language of a statute which was constituted and adopted with recognition of the existing rules of common law. We cannot say what we may think it should be because of personal antitrust philosophy or predilection.

Times-Picayune Pub. Co. v. United States, 1953, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277, is cited in Radovich, 352 U.S. at page 453, 77 S.Ct. at page 395, as setting up the tests by which any wholly non-frivolous claim of a plaintiff is to be tested.

In Times-Picayune the District Court had denied the government's motion for summary judgment which had urged that "the unit contracts" therein under attack were per se violations of § 1 of the Sherman Act. But after trial the District Court found that the defendants had instituted the unit contract system "in order to 'restrain general and classified advertisers from making an untrammeled choice'" between two competing papers "'in purchasing advertising space, and also to substantially diminish the competitive vigor of'" the opposing paper, and that this unit system was "economi-cally enforceable against (advertising) buyers, solely because of the Times-Picayune's 'dominant' or 'monopoly position.'" [36]

The Supreme Court, reviewing these findings, then related how the District Court had held § 1 of the Sherman Act violated; that "tying arrangements" depended upon the market setting; and, that in the market setting found by the Supreme Court, "we do not think that the Times-Picayune occupied a 'dominant' position in the newspaper advertising market in New Orleans." [37] It was therefore necessary for the Supreme Court to test the advertising contracts under attack

"* * * under the Sherman Act's general prohibition on unreasonable restraints of trade. For purposes of § 1, '[a] restraint may be unreasonable either because a restraint otherwise reasonable is accompanied with a specific intent to accomplish a forbidden restraint or because it falls within the class of restraints that are illegal per se.' United States v. Columbia Steel Co., 1948, 334 U.S. 495, 522, 68 S.Ct. 1107, 1121, 92 L.Ed. 1533. Since the requisite intent is inferred whenever unlawful effects are found, United States v. Griffith, 1948, 334 U.S. 100, 105, 108, 68 S.Ct. 941, 944, 946, 92 L.Ed. 1236; United States v. Patten, 1913, 226 U.S. 525, 543, 33 S.Ct. 141, 145, 57 L.Ed. 333, and the rule of International Salt [International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20] is out of the way, the contracts may yet be banned by § 1 if unreasonable restraint was either their object or effect. * * * For our inquiry to determine reasonableness under § 1 must focus on 'the percentage of business controlled, the

35. The three-judge dissent in Radovich is of no materiality here, because it is based upon the appropriate compulsions of *stare decisis,* and the binding effect of the Toolson case.

36. Times-Picayune Pub. Co. v. United States, 1953, 345 U.S. 594, 601, 73 S.Ct. 872, 97 L.Ed. 1277.

37. Id., 345 U.S. at page 611, 73 S.Ct. at page 882.

strength of the remaining competition [and] whether the action springs from business requirements or purpose to monopolize'. 334 U.S. at page 527, 68 S.Ct. at page 1124; compare Standard Oil Co. of California and Standard Stations v. United States, 1949, 337 U.S. 293, 312–313, 69 S.Ct. 1051, 1061–1062, 93 L.Ed. 1371." [38]

Mr. Justice Clark then treats the factual situation disclosed by the evidence, finds the advertising contracts were the results of endeavors to "rationalize" operations; were legitimate business aims; were not conceived to achieve monopolistic ends; were at least partially induced by competitive business considerations and "[did] not bespeak a purposive quest for monopoly or restraint of trade." [39]

---

38. Id., 345 U.S. at pages 614–615, 73 S.Ct. at page 883.

39. Id., 345 U.S. at page 623, 73 S.Ct. at page 889.

"Consequently, no Sherman Act violation has occurred unless the Publishing Company's refusal to sell advertising space except en bloc, viewed alone, constitutes a violation of the Act. Refusals to sell, without more, do not violate the law. Though group boycotts, or concerted refusals to deal, clearly run afoul of § 1, Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 214, 71 S.Ct. 259, 261, 95 L.Ed. 219; Associated Press v. United States, 1945, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013; see United States v. Columbia Steel Co., 1948, 334 U.S. 495, 522, 68 S.Ct. 1107, 1121, 92 L.Ed. 1533, different criteria have long applied to qualify the rights of an individual seller. Beginning with United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, this Court's decisions have recognized individual refusals to sell as a general right, though 'neither absolute nor exempt from regulation.' Lorain Journal Co. v. United States, 1951, 342 U.S. 143, 155, 72 S.Ct. 181, 187, 96 L.Ed. 162. If accompanied by unlawful conduct or agreement, or conceived in monopolistic purpose or market control, even individual sellers' refusals to deal have transgressed the Act. Lorain Journal Co. v. United States, supra; United States v. Bausch & Lomb Optical Co., 1944, 321 U.S. 707 [708], 721–723, 64 S.Ct. 805, 812–813, 88 L.Ed. 1024; Eastman Kodak Co. of New York v. Southern Photo Materials Co., 1927, 273 U.S. 359, 375, 47 S.Ct. 400, 404, 71 L.Ed. 684; United States v. Schrader's Son, Inc., 1920, 252 U.S. 85, 99, 40 S.Ct. 251, 253, 64 L.Ed. 471; cf. American Tobacco Co. v. United States, 1946, 328 U.S. 781, 808, 66 S.Ct. 1125, 1138, 90 L.Ed. 1575; Federal Trade Commission v. Beech-Nut Packing Co., 1922, 257 U.S. 441, 453–455, 42 S.Ct. 150, 154–155, 66 L.Ed. 307. Still, although much hedged about by later cases, Colgate's principle protects the

Times-Picayune Publishing Company's simple refusal to sell advertising space in the Times-Picayune or State separately unless other factors destroy the limited dispensation which that case confers.

"In our view, however, no additional circumstances bring this case within § 1. * * * With the advertising contracts in this proceeding viewed as in themselves lawful and no further elements of combinations apparent in the case, § 2 criteria must become dispositive here.

"An insufficient showing of specific intent vitiates this part of the Government's case. While the completed offense of monopolization under § 2 demands only a general intent to do the act, 'for no monopolist monopolizes unconscious of what he is doing', a specific intent to destroy competition or build monopoly is essential for the mere attempt now charged. United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 431–432; United States v. Griffith, 1948, 334 U.S. 100, 105, 68 S.Ct. 941, 944, 92 L.Ed. 1236; American Tobacco Co. v. United States, 1946, 328 U.S. 781, 814, 66 S.Ct. 1125, 1141, 90 L.Ed. 1575; Swift & Co. v. United States, 1905, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518. This case does not demonstrate an attempt by a monopolist established in one area to nose into a second market, so that past monopolistic success both enhances the probability of future harm and supplies a motivation for further forays. Cf. United States v. Griffith, supra; Swift & Co. v. United States, supra. And unlike Lorain Journal Co. v. United States, 1951, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162, where a single newspaper's refusal to sell space to advertisers unless they forewent advertising over a competing local radio station manifested 'bold, relentless, and predatory commercial behavior', id., at page 149, 72 S.Ct. at page 184, no remotely comparable charge is borne out here. * * *

[7] This case, to us, holds that "restraints of trade," as that language is used in the Sherman Act means "unreasonable" restraints of trade, and "unreasonable restraints of trade" are (1) illegal per se restraints interfering with free competition in business and commercial transactions which tend to (a) restrict production; (b) affect prices; or, (c) otherwise control the market to the detriment of the purchasers or consumers of goods and services, or (2) those restraints of trade, ordinarily reasonable, but made unreasonable because accompanied with a specific intent to accomplish the equivalent of a forbidden restraint.

Applying these tests to the instant facts we must ask:

(1) What is *the restraint* relied upon?

(2) Is the restraint *illegal per se?*

(3) If not, (*i. e.*, if an otherwise reasonable restraint) is it accompanied with *a specific intent to accomplish a forbidden restraint?*

(4) Was the *object* of the contract or combination under attack an *unreasonable restraint?*

(5) Was the *effect* of the contract under dispute an *unreasonable restraint?*

Times-Picayune further suggests, that in determining what constitutes an *"unreasonable restraint"* (either sought by or resulting from defendants' acts), we must determine (a) the percentage of business controlled; (b) the strength of the remaining competition; (c) whether the action criticized was the result of business requirements or done with a purpose to monopolize.

Here the restraint relied on, as we see from the complaint,[40] was in preventing plaintiff from obtaining *certain* electrical appliances for resale, while at the same time permitting Broadway-Hale to purchase those *certain* electrical appliances. This is a simple refusal to sell, allegedly by joint action. Various other competing electrical appliances were shown by the record before the trial court to be available to Klor's, Inc.[41] Many other retailers sold these "certain electrical appliances" to the public, fifty-three in the Mission District of San Francisco alone. The number of retailers in San Francisco from the start of the alleged conspiracy to the time of filing suit increased.

There was no charge or proof that by any act of defendants the price, quantity, or quality offered the public was affected, nor that there was any intent or purpose to effect a change in, or an influence on, prices, quantity, or quality, either directly or indirectly. It is not suggested that either the object or effect of the alleged conspiracy was to create an unreasonable restraint, illegal per se.

▮▮▮▮ If a business transaction and the effect and object of such transaction between two or more persons is lawful, then the transaction cannot be nor can it create an unlawful conspiracy. If "X Company," a manufacturer, refuses to sell to Klor's, Inc., and sells to "Y Company", a retailer who also agrees to buy from "X" as long as "X" does not sell to Klor's, more than one person is involved, and they have agreed not to sell, but their act is not necessarily [41a] illegal. To a minute degree, any refusal to sell is a restraint of trade, in the ordinary

---

· "We conclude, therefore, that this record does not establish the charged violations of § 1 and § 2 of the Sherman Act." Id., 345 U.S. at pages 624–627, 73 S.Ct. at page 889.

40. Tr. p. 8, para. III.

41. Twenty competing brands of television sets compared to the seven declared impossible to attain; eighteen competing brands of refrigerators, compared to three; twenty-three stoves, compared to five; thirty competing clothes washers

and dryers, compared to two. See Statement of Facts, supra.

41a. See the "simple example" suggested by Mr. Justice Black in Northern Pacific Railway Co. v. United States, supra, 355 U.S. at page 653, 78 S.Ct. at page 519:

"[I]f one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself."

sense; but it is not necessarily a restraint in the Sherman Act sense. Some restraints of trade are reasonable, and hence not violative. Others are not in, nor do they affect, interstate commerce, and hence are not violative. Others are so remote in their effect on the public at large as not to be restraints for Sherman Act purposes. Apex Hosiery Co. v. Leader, supra; Eastern States Retail Lumber Dealers Association v. United States, 1914, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490; Miller Motors v. Ford Motor Co., 4 Cir., 1958, 252 F.2d 441, affirming 149 F.Supp. 790; Hudson Sales Corp. v. Waldrip, 5 Cir., 1954, 211 F.2d 268; Fedderson Motors v. Ward, supra, note 20; Westmoreland Asbestos Co. v. Johns-Manville Corp., 2 Cir., 1943, 136 F.2d 844.

The purpose of the antitrust statutes is to protect the "public" from the harm which follows from concerted or monopolistic conduct designed to acquire control of a market, usually competitive, to which the public must ultimately resort and which conduct can be described as an undue restraint of trade.[42] Notwithstanding the many phrases which may be picked at random out of numerous cases and, out of context, be made to support the position that concerted conduct directed at harming the opportunity of a single trader to compete is always within the prohibitions of the Sherman Act, it is our opinion that there exists the need to show facts in a motion such as this from which a court might reasonably infer "public injury" before an antitrust violation is before the court; and, further, that the Supreme Court has not departed one whit from this requirement.

Where the particular conduct in restraint of trade is of the kind prohibited by the Act and where the inference of public injury reasonably can be extracted from the complaint, a good cause of action is stated. Assuming

these conditions are met, a private plaintiff has the right to bring an action for treble damages for injury to his business or property "by reason of anything forbidden in the antitrust laws (Title 15, U.S.C.A. § 15) and for an injunction." (Title 15, U.S.C.A. § 26.) However, the private right is not a remedy for a private wrong created by federal law. The private right is a method of enforcing public rights and thereby providing additional means of enforcing the prohibitions of the statute. "Congress * * * has provided sanctions allowing private enforcement of the antitrust laws by an aggrieved party." Radovich v. National Football League, supra, 352 U.S. at page 454, 77 S.Ct. at page 395. In this way it is entirely accurate to assert that "these laws protect the victims of the forbidden practices as well as the public." (Ibid.) But the private right is a purely incidental means of enforcing the Act. Before there can be any "forbidden practices" there must be an improper restraint of trade or commerce; once this is established or reasonably put in issue, the private right and the consequent private protection arise. Without the prohibited restraint, there is no private right for there has been no violation, i. e., there has been no conduct of defendants, which is or conceivably could be injurious to the public welfare. Plaintiff must allege (and here prove) that there has been a prohibited restraint and that he has been proximately damaged thereby in order to sustain his complaint or position against a motion to dismiss or for summary judgment. He need not allege, additionally, that the public has been injured by defendants' conduct. But to have the prohibited restraint there must be facts from which it can be determined that the "conduct charged * * * was reasonably calculated to prejudice the public interest by unduly restricting the free flow of interstate commerce." Kinnear-Weed Corp. v. Humble Oil & Refining Co., 5 Cir., 1954,

---

42. Wilder Mfg. Co. v. Corn Products Refining Co., 1915, 236 U.S. 165, 174, 35 S.Ct. 398, 59 L.Ed. 520; Eastern States Retail Lumber Dealers Ass'n v. United States, 1913, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490.

214 F.2d 891, 894. The Supreme Court in Radovich, relied on so heavily by plaintiff, said no more than this in quoting Justice Holmes' conclusion in Hart v. B. F. Keith Vaudeville Exchange, 1923, 262 U.S. 271, 274, 43 S.Ct. 540, 541, 67 L.Ed. 977:

> "It is enough (for purposes of motion to dismiss) that we are not prepared to say that nothing can be extracted from this bill that falls under the Act of Congress, or at least that the claim is wholly frivolous."

Turning now to the cases cited to us by plaintiff, we are unable to discern any deviation from what we have just stated. Plaintiff asserts that the case of Shotkin v. General Electric Co., 10 Cir., 1948, 171 F.2d 236, 238, established a new requirement for private antitrust litigation: that plaintiff is required to allege injury to the public in order to state a cause of action. We are unable to find any such requirement in Shotkin. In affirming the granting of a motion to dismiss, Judge Bratton, speaking for the Court, said:

> "Founded upon these broad concepts of public policy, the Act is limited in operative scope and effect to combinations, agreements, or concerts which tend to prejudice the public interest by unduly restricting competition or unduly obstructing the due course of trade, or which because of their evident purpose or inherent nature injuriously restrain trade in the competitive markets.
>
> \* \* \* \* \* \*
>
> "It is essential to recovery in an action of this kind that plaintiff allege and prove two things: a violation of the Act, and damages to plaintiff proximately resulting from the acts and conduct of the defendants which constitute the violation of the Act. Injury to plaintiff, of itself and alone, is not sufficient to warrant a civil action of this nature

for injunctive relief and damages. There must be harm to the general public in the form of undue restriction of trade and commerce as a result of the wrongful contract, combination, or concert. \* \* \*

"\* \* \* In other words the complaint failed to allege facts from which it could be determined as a matter of law that a combination or conspiracy was entered into which brought about an increase in prices to the consuming public, a diminution in the volume of merchandise in the competitive markets, a deterioration in the quality of the merchandise available in the channels of commerce, or other like evil consequence in the free flow of interstate commerce." [43]

We are unable to discern any new doctrine in the above extract. It seems to be no more than a concise and accurate statement of well-established requirements for private recovery under the antitrust provisions.

■ It is true that on a motion for dismissal the complaint is to be broadly interpreted in a manner most favorable to the pleader; [44] but that does not mean that the court must find allegations of ultimate facts in conclusionary pleading, or a violation of the Sherman Act from allegations of action directed solely at plaintiff and which, as such, could have as a matter of law no conceivable effect on the competitive market.

Similarly with Fedderson Motors v. Ward, supra, which plaintiff argues continued the "new requirement" of public injury supposedly injected by Shotkin. Fedderson also is a case where, on affirming a judgment dismissing the complaint, the court was unable to find any allegation of material fact evidencing an antitrust violation.

The Supreme Court in Radovich v. National Football League, supra, termed

---

43. 171 F.2d at pages 238–239.

44. Radovich v. National Football League, supra; William Goldman Theatres, Inc., v. Twentieth Century Fox Film Corp., E.D.Pa.1957, 151 F.Supp. 840.

controlling of this case by plaintiff, did not, in our opinion, in any way overrule these cases. The Court in Radovich did no more than to re-assert Justice Holmes' admonition that the test of sufficiency of the complaint is whether "the claim is wholly frivolous." Id., 352 U.S. at page 453, 77 S.Ct. at page 395. In reversing this Court the Supreme Court determined that the allegation of defendants' attempt to eliminate from competition the All-America Conference, defendants' *only* competitor in professional football, which thereby caused injury to the plaintiff in his business or property, was sufficient to sustain the complaint against a motion to dismiss for failure to state a cause of action under the antitrust laws. Read thus, the Radovich case is entirely consistent with Shotkin, Fedderson, and all other cases in which the Supreme Court and the lower federal courts have adhered to the requirement that a violation of the Sherman Act requires conduct of defendants by which the public is or conceivably may be ultimately injured.[45]

Plaintiff cites us many cases involving group boycotts, discrimination, and the use of large scale buying power to drive out a competitor. And he supplies us with many quotations which at first blush appear to support his position. But each of his authorities involves factual situations entirely different from the one before us; factual situations in which the random phrases picked by plaintiff are proper and not inaccurate; they do not, however, support the contentions made here.

We are told that the antitrust laws are a trader's statute and cited to Mandeville Island Farms v. American Crystal Sugar Co., 1948, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; but that case holds that the antitrust statute "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers." Id., 334 U.S. at page 236, 68 S.Ct. at page 1006. The statute, so Mandeville Island Farms decides, includes protection against the anti-competitive conduct of *buyers* also. But the reason for such protection, is as always, fear of the detrimental effect on the public which these practices may have. In holding that concerted action by processors directed against growers is barred by the antitrust laws, the Court did not intend such a phrase as protection of "all who are made victims of the forbidden practices" (Id., 334 U.S. at page 236, 68 S. Ct. at page 1006) to be used to create a cause of action for a single competitor injured by action directed solely at him which has no substantial effect on competition. Where there is no conceivable way in which a substantial segment of the public can be injured by the conduct attached, the Sherman Act is not violated. Apex Hosiery Co. v. Leader, supra. The Mandeville Island Farms case is in no way contrary. It is not authority for the proposition that conduct directed solely and exclusively at an individual competitor is illegal, unless the result is a substantial lessening of competition in the particular market involved.[46]

In each of the "Theatre" cases relied on by plaintiff, defendants' conduct either did or was intended to eliminate the sole competitor in a particular market, was directed at one of a very small number of competitors,[47] or involved the use of large scale monopolistic power derived from nationwide enterprises to eliminate a competitor and thereby substantially affect competition in the local market area. See, e. g., United States v. Schine Chain Theatres, 1948, 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245; United States v. Griffith, 1948, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236; Bigelow v. RKO Radio Pictures, 1946, 327 U.S. 251, 66

---

45. See Mandeville Island Farms v. American Crystal Sugar Co., 1948, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; Apex Hosiery Co. v. Leader, supra; Report of the Attorney General's National Committee to Study the Antitrust Laws 12 (1955).

46. See International Salt Co. v. United States, 1947, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20.

47. Removal of any one competitor thereby having a substantial effect on competition.

S.Ct. 574, 90 L.Ed. 652; Binderup v. Pathé Exchange, 1923, 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308; Hart v. B. F. Keith Vaudeville Exchange, supra; Paramount Film Distributing Corp. v. Village Theatre, 10 Cir., 1955, 228 F.2d 271; William Goldman Theatres v. Loew's, Inc., 3 Cir., 1945, 150 F.2d 738; White Bear Theatre Corp. v. State Theatre Corp., 8 Cir., 1942, 129 F.2d 600; Victor Talking Machine Co. v. Kemeny, 3 Cir., 1921, 271 F. 810.

Finally to be considered are those cases cited to us in which price fixing or some other form of complete market control was involved and where defendants' conduct was directed at a particular class of persons of which plaintiff was one. Here again it is clear that control or attempted control of all competitors is the evil which causes the contracts, combinations, or conspiracies to be the type prohibited by § 1 of the statute. These cases are not here applicable; the conduct involved either was intended to control the entire market and was directed at plaintiff because he refused to conform or was directed at an entire class of defendants' competitors, buyers, or sellers, one of whom was the plaintiff. See, e. g., Radovich v. National Football League, supra; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; Fashion Originators' Guild of America v. F.T.C., 1941, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; Flintkote Co. v. Lysfjord, 9 Cir., 1957, 246 F.2d 368; United States v. Tarpon Springs Sponge Exchange, 5 Cir., 1944, 142 F.2d 125; Package Closure Corp. v. Sealright Co., 2 Cir., 1944, 141 F.2d 972; Roseland v. Phister, 7 Cir., 1942, 125 F.2d 417; Johnson v. J. H. Yost Lumber Co., 8 Cir., 1941, 117 F. 2d 53. Not one of the out of context quotations from the foregoing cases used by plaintiff will support his position when read within its factual setting.

■ Count one of the complaint, with which we are here solely concerned, alleges, in paragraph six, that defendant Broadway-Hale, in combination with each of the manufacturing-distributing defendants, prevented *plaintiff* from obtaining products to sell to the public. There is no allegation of actual, attempted, or intended control of the market in which plaintiff and defendant Broadway-Hale competed, considering the market to be either the retail sellers of the Mission District of San Francisco, the city itself, or the purchasing public. Defendants' affidavits, submitted under the provisions of Rule 56 of the Federal Rules, as well as the facts of which this Court may take judicial notice leave no doubt that the conduct directed at this particular plaintiff and only at this plaintiff did not and could not have under the circumstances any substantial effect on market competition. As defendants point out there are literally hundreds of dealers in the San Francisco Bay Area dealing in the same kinds and brands of major appliances as plaintiff and defendant Broadway-Hale. On Mission Street, along with the plaintiff and Broadway-Hale, there are over forty retail dealers. Additionally, there are numerous brands of appliances to which plaintiff was not denied access and which compete favorably with those he was denied.[48] In light of our previous discussion, such allegations, especially when considered on motion for summary judgment rather than on motion for dismissal of the complaint, do not allege facts from which it can be inferred that there was or may be a substantial effect on competition, and therefore do not allege a violation of § 1 of the antitrust laws—they do not state facts from which injury to the public can be perceived.

The first sentence of paragraph six of count one of plaintiff's complaint is of no assistance to appellant. It alleges only that "defendants * * * have restrained trade and commerce * * *

48. See the Supreme Court's discussion of the effect of competing alternatives on alleged antitrust violations in Times-Picayune Pub. Co. v. United States, supra.

by contracting, combining, and conspiring together \* \* \* in restraint and monopoly of such trade and commerce \* \* \* and have thereby substantially lessened, limited and restrained competition in said trade and commerce. \* \* \*" This is no more than the pleader's conclusion that defendants have restrained trade and commerce by restraining trade and commerce. It states no facts from which illegal action can be perceived or inferred. Paragraph eight of count one speaks of Broadway-Hale's "monopolistic buying power" enjoyed "by reason of the large number of retail outlets it operates." But the essence of this allegation is that Broadway-Hale "has purchased and continues to purchase the products of the manufacturer-distributor defendants upon the condition that the manufacturer-distributor defendants do not sell their products to the plaintiff." We find no basis for determining that Broadway-Hale intended, or had the power if it so intended, to effect such conditions on its purchases in such scope as to appreciably affect competition among retailers generally in their purchases or sales to the public. It is well known that appliance sales are within a most highly competitive market. As between two dealers, one may be able to condition his purchases by requiring no sales to the other. So long as the ability to so condition one's own purchases does not substantially interfere with either the "retailing public" or the "consuming public," there is no conduct which violates the provisions of the antitrust laws.

■■■ In determining whether certain conduct was "in restraint of trade or commerce," we re-emphasize what was said by the Court in Apex Hosiery Co. v. Leader, supra, 310 U.S. at pages 493, 500, 60 S.Ct. at page 992:

"The end sought (by the Sherman Act) was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or *otherwise* control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public injury. \* \* \*.

"\* \* \* [R]estraints, actual or intended, prohibited by the Sherman Act are only those which are so substantial as to affect market prices. Restraints on competition or on the course of trade in the merchandising of articles moving in interstate commerce is (sic) not enough, unless the restraint is shown to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition." [Emphasis added.]

In other words, restraints, in order to be violative of the law, must operate, or be intended to operate, to restrict commercial competition in a *substantial* manner.

We believe this to be an accurate and controlling statement of the law applicable in determining whether particular conduct conceded to exist does or does not constitute a violation of the antitrust laws. Neither Shotkin v. General Electric Co., supra, and Fedderson Motors v. Ward, supra, nor the cases which follow and rely on them are to the contrary; nor does Radovich v. National Football League, supra, weaken or limit the conclusions derived from the Apex case.

■■■ We hold, therefore, that plaintiff's first cause of action, as proved, is fatally defective. The facts prove no more than a squabble between two of many competitors in a highly competitive market area. The facts prove no conduct in violation of the antitrust laws because there has been no conduct by which the "public" could conceivably suffer injury. Construing the complaint and affidavits together, and considering the facts judicially known to this Court and the court below, the motion for summary judgment was properly granted.

The judgment is affirmed.